149 So. 425

**STATE v. PLUMLEE.**

No. 32316.

May 29, 1933.

Rehearing Denied July 7, 1933.

Williams & Blackshear, of Oaksdale, for appellant.

Gaston L. Porterie, Atty. Gen., James O'Connor, Asst. Atty. Gen., and John J. Robira, Dist. Atty., and Sam H. Jones, Asst. Dist. Atty., both of Lake Charles (James O'Niell, Asst. Atty. Gen., of counsel), for the State.

ODOM, Justice.

The defendant was indicted for murder, convicted of manslaughter and sentenced to hard labor for a term of not less than two nor more than seven years. He appealed and sets out the errors of which he complains in six bills of exception.

(1) Bill No. 1 refers to an alleged error in the drawing of the jury. At the opening of the term of court, there were thirty names in the jury box. The first case called was triable by a jury of five. The jury for that case was completed, the case tried, and, while the jury was out deliberating, the case against the defendant was called. All the remaining names in the jury box were drawn out, the regular panel was exhausted, and the court ordered the summoning of fifty tales jurors. In the meantime it was discovered that only twenty-two names had been drawn

from the regular box, which added to the five sworn to try the first case made only twenty-seven in all, three less than the number which were in the box when it was opened. On investigation it was found that the sheriff, in calling jurors for the trial of the first case, had drawn from the box eight names, three of the jurors drawn being rejected. When the jury of five was completed for the trial of the first case, the sheriff, instead of placing the names of the three jurors not accepted back into the box as he should have done, laid the three on the table beside the box along with the five. When this was discovered, the court ordered the three names put back into the box and the drawing was proceeded with as if they had been placed back in the box by the sheriff at the completion of the first jury. The trial judge says in his per curiam that the irregularity was not due to any fraud or ill practice but was purely unintentional and due to an oversight which resulted in no hurt or injury to defendant.

We concur in this view.

"No judgment shall be set aside, or a new trial granted by any appellate court of this State, in any criminal case, on the grounds of misdirection of the jury or the improper admission or rejection of evidence, or as to error of any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a consti-

tutional or statutory right." Code of Criminal Procedure, art. 557.

We find no error in the court's ruling on this bill.

■ (2) Bill No. 2 was reserved to the refusal of the trial judge to give certain special charges. The judge says in his per curiam that he refused to give the charges for the reason that some of them were unauthorized by law and that his general charge sufficiently and correctly stated the law applicable to the facts disclosed in the trial.

In this connection it is necessary to state the facts and circumstances leading up to and connected with the homicide for which the defendant was prosecuted.

Deceased was killed by the discharge of a trap or spring gun set by defendant in his barn, in which was a henroost, the defendant at the time being nearly a mile away. The barn is situated some seventy-five yards from defendant's residence and is used in connection therewith as an outhouse. It appears that none of the members of defendant's family were in the residence at the time of the homicide and, as said, he was nearly a mile away. The barn, it appears, is of considerable length and has an open passageway running from one end to the other with stalls on each side. One of these stalls was used as a roosting place for defendant's chickens. This stall opens out into the main passageway but was not inclosed or shut off from it by gates, doors, or any other obstacle, so that one could pass from the long passageway into the stall to where the chickens roosted without having to remove or displace any structure. On the

other side of the passageway, and directly opposite the one occupied by the chickens as a roosting place, is another stall which is inclosed and apparently used as a bin. A shotgun was set by defendant in this bin, the muzzle or barrel of the gun projecting through a hole in the front wall pointing directly toward the henroost. A wire was attached in some way to the gun and stretched across the passageway which separates the bin from the roost, the arrangement being such that a disturbance of the wire caused the gun to be discharged. The body of this deceased was found either in the passageway or in the stall where the chickens were with the entire charge of the gun lodged in his head. The supposition is that he came in contact with the wire either in the hallway or as he was attempting to enter the henroost.

The long passageway through the barn was inclosed at one end by gates which were probably closed and held together by a latch at the time deceased entered the barn. The probabilities are that deceased opened these gates when he entered the barn, but it is stated that they were not high and that he could have entered by climbing over them. The other end of the passageway was inclosed by wire, which was not disturbed.

In order to reach the henroost and the place where the gun was set, the deceased had to enter the barn through the gate and walk down the open space or hallway, the exact distance not being disclosed. The gun was not set at the entrance to the barn but down the passageway at a place opposite the henroost. We quote the following statement from the brief filed by counsel for defendant:

"The stall or place inside of which his chickens were kept was inside of the barn or stable, and inside of a stall in that barn or stable. In other words, in order to reach the place where the trap gun was set in his place, this man (the deceased) had to break and enter his barn or stable and then enter the particular stall in which the chickens were kept."

It is shown further that at the time of the homicide, there were only eleven chickens in the stall, and it is conceded that these were of no considerable value.

In the brief filed by defendant's counsel they state further:

"Randolph Plumlee (the defendant) is a farmer living north of Oakdale. At first he had a farm several miles north of Oakdale in a region inhabited by people who are called 'red bones'. He suffered from having his property stolen every day. He then moved down closer to Oakdale to another farm and the stealing continued until he had left only eleven chickens out of eighty-five. His hogs were all stolen; to cap the climax his yearling beef was killed and slaughtered at his back gate."

(3) The admitted purpose and intent of defendant in setting the trap or spring gun was to protect his property by killing the thief, and his main defense is that the homicide which resulted is excusable under the facts and circumstances disclosed.

As a basis or foundation for this defense, his counsel prepared and submitted the following special charges which the trial judge

was asked to give as the law applicable to the case. These charges were refused and this bill was reserved.

Special charge No. 1: "The breaking and entering of a barn or chicken house belonging to accused inside of his yard or near his residence, being part of his premises, in the night time for the purpose of stealing his property, is felony."

Special charge No. 2: "The unlatching of a gate to a barn or the lifting of a latch or the unlocking of a wire fastening or pushing open of a door which had been shut, constitutes breaking and entering, particularly if done in the night time."

Special charge No. 3: "A man in his own house or on his own premises that is, in the out houses, barn or chicken house, forming part of his premises, in order to prevent a felony, has a right to use force and to kill the person breaking and entering, if necessary."

Special charge No. 6: "Where it is shown that the property and goods of the defendant had been repeatedly stolen and to the extent of impoverishing him, and he had appealed in vain to the officers for protection, and the series of thefts had culminated when his cattle were stolen at his own gate, and he believed and 'has reason to believe that he and his family were in constant danger, the setting by him of a trap gun inside a locked building for the purpose of protecting his goods from further theft, does not constitute murder if a person committing felony is killed while breaking and entering said building."

As purely abstract propositions, numbers 1 and 2 correctly state the law. The barn and henroost is an outhouse, and if deceased broke and entered it at night, he was guilty of a felony under Revised Statutes, § 852, as amended by Act No. 15 of 1912. Breaking as an element of burglary may consist of merely opening a door, though unlocked, or the removal or displacement of any structure which obstructs free passage. These charges were properly refused because not pertinent or relevant to the issue involved under the facts disclosed, as we shall presently show.

Charge No. 3, while correct in part, is also irrelevant and was properly refused.

Charge No. 4 sets out two wholly separate and distinct propositions. One is that a person whose property has been depredated upon by thieves has the legal right to set a trap gun on the inside of his building and by that means kill any person who might come to commit theft. This point is pertinent and relevant to the issue involved in this appeal and is relied upon mainly as a defense. This part of the requested charge was properly refused for the reason that it is wholly unfounded in law as will be shown later on in this opinion.

The other point involved in this requested special charge is in substance that if the defendant had reason to believe and did believe that he and the members of his family were in constant danger of bodily harm, his act in setting the gun and killing deceased was excusable homicide. This point was covered by the general charge, as follows:

"Thus we are justified in killing another if it reasonably appears necessary to do so in order to prevent him from killing or greatly injuring us or some other innocent person, provided we have done nothing wrong to excuse him from attempting such an act. And we would be justified in killing another if it reasonably appeared necessary to do so in order to prevent him from entering our habitation with apparent intention of committing a crime, while we or others entitled to our protection were thereon. Likewise, we would be justified in killing another if it reasonably appeared necessary to do so in order to prevent him from committing any other great crime of violence, as a rape, riot, or a robbery by force, with deadly weapons.

"Two things must concur in order to justify us in killing another to prevent him from committing some act; first, it must reasonably appear necessary in order to prevent him from committing a crime; and second, the crime to be prevented must be a great crime, and not a petty offense from which no great injury would result to us or others, in body or property. Therefore, if it reasonably appears that the crime can be prevented by any other available means, as by a warning, by a show of force, or by the use of any force short of killing, the killing would not be justified. And if the crime to be prevented was a petty offense, not likely to result in great injury in body or property to us or others, we would not be justified in killing to prevent it, even if it could not be prevented by any other means."

▇ (4) We have not heretofore had occasion to consider cases of homicide or personal injury caused by the setting of traps or spring guns. But such cases have assumed a wide range in other jurisdictions and the subject-matter is discussed at considerable length by Bishop and Wharton. Reference to such cases is made also in Cyc., Corpus Juris, and Ruling Case Law. The general rule recognized by text-writers and the courts is that a person is not justified or excused in taking human life or inflicting bodily harm upon the person of another by means of traps, spring guns, or other instruments of destruction, unless as a matter of law he would have been justified or excused had he been personally present and taken the life or inflicted the bodily harm with his own hands.

21 Cyc. 821; 30 C. J. 86, § 267; 13 Ruling Case Law 853; State of Missouri v. Beckham, 306 Mo. 566, 267 S. W. 817, 37 A. L. R. 1094.

▇ The defendant having admitted that he set the gun by which the deceased was killed, that his purpose and intent in doing so was to kill any one who might intrude upon his property, and having set up the defense that he was legally justified in taking such steps in order to protect his property, the question which arises and which it is necessary to decide is whether as a matter of law he would have been justified in killing deceased with his own hands had he been personally present under the admitted circumstances surrounding this case.

Our conclusion is and we hold that the taking of human life under such circumstances as those disclosed in this case is neither justifiable nor excusable, but on the contrary is an unlawful homicide under our law.

The setting of the trap or spring gun by defendant on the inside of his barn was not

done to prevent the commission of a forcible, violent, or atrocious felony, or a felony of any kind, but to kill a thief who, if he had stolen all the chickens in the barn, would have been guilty of no more than petty larceny. It is admitted that there were only eleven chickens in the barn, worth probably not more than a few dollars. It cannot be reasonably contended that the gun was set for the purpose of preventing the crime of breaking into the barn, for it was not set at the entrance or near the gate which had to be opened in order to get into the building, but down the alley or passageway some distance from the gate, at a point opposite the henroost and pointing directly toward it. The gun was so set that its discharge could not have killed a person before or while opening the gate or while passing through the entrance. It is therefore perfectly clear that the purpose of setting the gun was to kill any person who, after entering the building, might attempt to enter the stall and lift the chickens from the roosts. In other words, defendant's manifest purpose in setting the gun was to kill a thief.

It is also manifestly clear that the crime or offense which defendant anticipated would be committed and to prevent which he set the gun would not involve his own personal safety or the safety of any member of his family. After setting the gun he left home and at the time of the homicide was nearly a mile away, and no member of his family was at the premises. Not only that, the barn used as a henroost was seventy-five yards from his residence and entrance into it could be made without the slightest force or violence or even disturbance. Entry into the barn could be made secretly and quietly. The pertinent

question then is whether defendant, had he been personally present, would have been justified or excusable for slaying the deceased under the circumstances.

The question whether a man is excusable for taking human life merely and solely for the purpose of protecting his property is not at issue and we shall not discuss the case from that standpoint. The only question involved under this point is whether one is excusable for slaying another who is in the act of stealing property of inconsiderable value.

■ If any point is settled or can be settled, it is that larceny, being a secret crime not attended with force or violence, and especially when the goods taken are of small value, furnishes no warrant to one person for killing another to prevent its consummation. It has been so held four times in this state in cases involving the stealing of chickens. Bibb v. Hebert, 3 La. Ann. 132; Carmouche v. Bouis, 6 La. Ann. 95, 54 Am. Dec. 558; McCutcheon v. Angelo, 14 La. Ann. 34; Gardiner v. Thibodeau, 14 La. Ann. 732.

These were all civil cases, but the principle announced is applicable to criminal cases as well.

In State of Washington v. Marfaudille, 48 Wash. 117, 92 P. 939, 14 L. R. A. (N. S.) 346, 15 Ann. Cas. 584, it was held that one has no right to take human life directly or indirectly to prevent trespass or any other petty crime.

In Bloom v. State, 155 Ind. 292, 58 N. E. 81, it was held that the killing of one person by another to prevent the crime of petit larceny is not justified or excusable. See, also, State v. Vance, 17 Iowa, 138; McDaniel v. State, 8 Smedes & M. 401, 47 Am. Dec. 93.

Petit larceny is a mere misdemeanor and a homicide committed in endeavoring to restrain the commission of a misdemeanor is not justifiable. People v. Grimes, 132 Cal. 30, 64 P. 101; Crawford v. State, 90 Ga. 701, 17 S. E. 628, 35 Am. St. Rep. 242; Bowman v. State (Tex. Cr. App.) 21 S. W. 48.

Petit larceny is a trespass and the law does not recognize the right to kill in order to prevent a trespass either on lands or goods. Chapman v. Commonwealth, 15 S. W. 50, 12 Ky. Law Rep. 704; Wallace v. United States, 162 U. S. 466, 16 S. Ct. 859, 40 L. Ed. 1039; Powers v. People, 42 Ill. App. 427; People v. Hecker, 109 Cal. 451, 42 P. 307, 30 L. R. A. 403; State v. Warren, 1 Marv. (Del.) 487, 41 A. 190; State v. Edgerton, 100 Iowa, 63, 69 N. W. 280; Coon v. State, 11 Ala. App. 46, 65 So. 911; Drew v. State, 136 Ga. 658, 71 S. E. 1108.

Under the general heading "Homicide" it is said in 13 Ruling Case Law, p. 840:

"No injury to property rights can authorize a resort to this extreme measure; and it is clear that if one deliberately kills another to prevent a mere trespass to his property— whether the trespass could or could not be otherwise prevented—he is guilty of murder."

In the same volume on page 839 it is said:

"It is not true as a general rule that an invasion of property rights constitutes an excuse for homicide. On the contrary it is only when the element of danger to the person is present that the law countenances the taking of human life", and "While, as sometimes has been said, the right to take life in defense of property may be a 'natural right', yet its exercise is limited strictly to the prevention of forcible and atrocious crimes. It is commonly said that the crime must be a felony."

Numerous cases are cited in support of the text. 30 C. J. 85, § 266.

"Although a person may use such force as is reasonably necessary to protect his property, real or personal, he is not justified or excused in taking life in defense of such property, other than his habitation, in order to prevent a mere trespass, or larceny." 21 Cyc. 830.

"A felonious homicide is committed by one who inflicts death in opposing an unlawful endeavor to carry away his property. There is here the right to resist but not to the taking of life." Bishop on Criminal Law (9th Ed.) § 876.

"Larceny is a secret crime not attended with force, and the killing by one person of another to prevent larceny of a small amount, such as petit larceny is not justified, since its justification would sanction punishment with death an offense for which the law has provided a much milder punishment. Where the owner of the property tries to prevent the theft or recover the property, however, and is resisted, he may repel force with force and need not retreat and if the thief is unavoidably killed, the homicide is justified." Wharton on Homicide, § 825.

From this it follows necessarily that one is not justified in taking human life by means of death traps to prevent the commission of such minor crimes as petit larceny, for what a man is not permitted to do directly, he may not be indirectly. Mechanical traps and spring guns are silent instrumentalities of death. They deal death and de-

struction to the innocent as well as the criminal intruder without the slightest warning. The taking of human life by such means is brutally savage and inhuman. If one is personally present when another attempts unlawfully to carry away his personal goods, it is his duty before taking any action to warn the thief to desist. But no warning can be given by these secret implements of destruction.

In the state of Missouri, the owner of a chilli and soft drinks stand which had been depredated upon by thieves set a spring gun to protect it. A boy who apparently attempted to enter the place was killed by the gun. The proprietor was indicted and convicted. The Supreme Court of Missouri upheld the verdict, saying that the killing was unlawful. State of Missouri v. Beckham, 306 Mo. 566, 267 S. W. 817, 37 A. L. R. 1094.

In a note following this case at page 1101 of 37 A. L. R., it is said:

"The reported case (State v. Beckham) follows the prevailing rule, which seems to be that if a homicide results from the setting of a spring gun for the protection of property, the person setting the gun will be liable for murder or manslaughter, and that the use of such guns can never be justified on the ground that they were set to protect property."

In some of the earlier cases, as in Gray v. Combs, 7 J. J. Marsh, 478, 23 Am. Dec. 431, a Kentucky case decided in 1832, it was held that one who sets traps or spring guns to protect valuable property by means of which another is killed while attempting to enter the premises was guilty of no crime. To the same effect or practically so are the cases of U. S. v. Gilliam, Fed. Cas. No. 15,205a, 1 Hayw. & H. 109 (decided in 1882), and State v. Moore, 31 Conn. 479, 83 Am. Dec. 159 (decided in 1863).

But later cases have departed from this ancient rule and it is now generally held that if a homicide results from the setting of traps or spring guns for the protection of property, the person setting the trap or gun is guilty of murder or manslaughter and that the use of such instruments of death can never be justified on the ground that they were used solely for the protection of property. State of Missouri v. Beckham, supra; Simpson v. State, 59 Ala. 1, 31 Am. Rep. 1; State v. Marfaudille, 48 Wash. 117, 92 P. 939, 14 L. R. A. (N. S.) 346, 15 Ann. Cas. 584; State v. Green, 118 S. C. 279, 110 S. E. 145, 19 A. L. R. 1431; 13 R. C. L. 853 § 155.

Special charges Nos. 4 and 7. Defendant offered some testimony tending to show that deceased had assisted in setting the trap gun and knew of the arrangement, and the court was asked to instruct the jury that if they found such to be true, the defendant should be acquitted.

This charge was properly refused. The setting of the gun by defendant was for the purpose of killing any one who might enter the barn to steal. But the contrivance was so arranged as to kill any one who might enter, whether to steal or not. The trap set by defendant was an instrument for the unlawful taking of human life and he was responsible for whatever harm might result from it. One who unlawfully sets a death trap does so at his peril. Felonious homicide is the killing of a human being without justification. The fact that deceased had knowledge of the setting of this death trap, if he did, was a warn-

ing to keep out of the barn. But the further fact that he failed to heed the warning was no legal justification for defendant's taking his life because he ignored it. If defendant had been personally present when deceased approached the henroost and had at the time warned him to keep away or desist, and deceased had failed or refused to heed the warning, defendant would have had no legal right to kill him solely to prevent the theft.

Bill No. 3 was reserved to that part of the court's general charge to the effect that if deceased knew of the setting of the gun, defendant was guilty of no crime. We have already disposed of this contention.

Bill No. 4 was reserved to the court's refusal to prohibit the district attorney from propounding the following interrogatory to the jurors on their voir dire examination:

"If the judge should charge you that it is a violation of the law for a man to set a trap or spring gun for the purpose of killing any person who might attempt to steal chickens in the place where the trap or spring gun is set that such act of setting the spring gun and the subsequent killing of a person by that means would constitute the crime of murder, would you accept the law and follow it in arriving at your verdict?"

This was an unusual case, the legal principle involved being wholly unfamiliar to the average juror. No case involving the taking of life by means of traps or spring guns is reported in our decisions and probably none have been tried in the district courts. Just what attitude the prospective jurors would take toward the law on the subject could not be known without inquiry. The state had the right to know. Some men are prejudiced against certain laws, will not convict on certain kinds of evidence, and even though the law prescribes death as one of the penalties for murder, they will not render a verdict carrying with it that penalty. Both the state and the defense have the right to know the feeling and state of mind of jurors.

Where unusual and novel points of law are involved, the state has the right to know what attitude the prospective juror will take toward it and whether he will follow the court's charge concerning it. While it is the duty of jurors to follow the law as given them in charge by the court, yet experience teaches that men frequently entertain prejudice not only against particular laws but against particular defenses as well, and if such prejudice is strong enough, it will necessarily disqualify them from jury service in such cases.

This identical question was before the Supreme Court of the state of Washington in 1907, in the case of State v. Julius Marfaudille, supra. That was a trap gun case and the court held that the trial court did not err in permitting the state to propound such questions.

Bill No. 5. The state, over the objection of defendant proved by one witness that after the homicide defendant said to a cousin of deceased:

"I will put you where I put your henhouse cousin" (referring to deceased), and to another, "I will shoot your head off just as I did your henhouse cousin."

This testimony was objected to by defendant on the ground of irrelevancy. The testimony was relevant as tending to show

that defendant assumed responsibility for the death of deceased and also for the purpose of showing deliberation and intent.

 Bill No. 6. Defendant reserved this bill to the refusal of the court to permit him to prove that prior to the date on which he set the gun, other property of his had been stolen. The ruling of the court was correct. No one has the legal right to kill another as a punishment for wrongs already committed nor has he the right to take human life to prevent secret trespasses upon his personal goods.

 Defendant moved for a new trial which was refused and he reserved a bill. In his motion he set out that the verdict was contrary to the law and the evidence, which presents nothing for review. He further sets up all the errors complained of as shown by the various bills of exception. As we have disposed of those complaints, it is unnecessary to review them under this motion.

For the reasons assigned, the verdict and sentence are affirmed.

LAND, J., dissents and hands down reasons.

ROGERS, J., dissents from the ruling on bill of exception No. 2.

LAND, Justice.

1. At the outset, the writer of this dissenting opinion wishes to make it very plain that deceased was not killed by a spring gun set by defendant, while deceased was in the act of stealing chickens roosting on the fence of defendant's backyard, or while deceased was in the act of breaking into an ordinary wooden or wire chicken coop or chicken house.

It is unanimously agreed by the court that it is not excusable to take human life for the theft of chickens, a mere misdemeanor, or for breaking into any ordinary chicken coop or chicken house, a mere trespass.

It is admitted in the majority opinion that deceased was killed by a spring gun set by defendant *in his barn*, an outhouse located on defendant's premises; that *this barn* was of considerable length; that it had a long passageway running through it with stalls on each side, and was closed at one end by wire and at the other end by latched gates. It is also stated in the opinion of the majority that, "The probabilities are that deceased *opened* these gates *when he entered the barn*."

During the argument of this case, counsel for the state also admitted that defendant's barn was entered by deceased *"in the night time."*

Under Act No. 72 of 1926, the breaking and entering *in the nighttime* of *a barn*, store, shop, warehouse, or a garage, with intent to steal, *is a burglary and felony*, necessarily punishable by imprisonment *at hard labor*, not exceeding *ten years*.

The force required to constitute "burglary" does not necessarily mean the breaking of a lock or of a fastening. Unlocking or unlatching a door or pushing open an unlocked or unlatched door constitutes burglary. Wharton's Crim. Law, vol. 11 (11th Ed.) pp. 1192, 1193.

The opening, therefore, by deceased of the latched gates of defendant's *barn in the night-*

*time* made the breaking complete under Act No. 72 of 1926, and the intent of deceased' to steal is proved by the fact that his body was found at the entrance of the stall of the barn in which defendant's fowls roosted, and across which the wire pulling the trigger of the spring gun had been stretched, thereby making it certain that deceased had come in contact with this wire while attempting to enter the stall in which defendant's fowls roosted.

"Whether the felonious intent be executed or not is immaterial, supposing that it can be inferred." Wharton's Crim. Law, vol. 11 (11th Ed.) p. 1225.

It is not necessary, therefore, in this case to show that the deceased accomplished the purpose he had in breaking and entering defendant's barn.

It is also immaterial, in this case, whether deceased broke and entered defendant's barn in the nighttime with intent to steal eleven chickens, or eleven mules, or eleven cows, since the crime of burglary does not depend at all upon the value of the goods intended to be stolen.

It is the mature conviction of the writer of this dissenting opinion that, under all of the facts of this case, deceased was guilty of the crime of *burglary, a felony* under the criminal statutes of this state, and that he was not ruthlessly slain by the spring gun set by defendant *in his barn*, merely for the theft of chickens, or for a mere trespass in entering the barn of defendant.

The trial judge therefore erred, in my opinion, in refusing to give to the jury in this case the following charges:

"Special Charge No. 1. *The breaking and entering of a barn* or chicken-house belonging to accused inside of his yard or near his residence, being a part of his premises, *in the night time* for the purpose of stealing his property, *is a felony.*

"Special Charge No. 2. The unlatching of a gate to a barn or the lifting of a latch, or the unlocking of a wire fastening, or pushing open of a door which had been shut, constitutes breaking and entering, particularly if done in the night time."

The charge of the trial judge to the jury in this case shows upon its face that he considered that the deceased had committed a mere trivial trespass in breaking and entering the barn of defendant in the nighttime, with the intent to steal, as if the barn were a mere "chicken-house" and nothing more. Under such a charge, nothing was left to the jury except to convict the accused.

2. The majority opinion also holds that a property owner of this state is not justified or excused in taking the life of even a burglar and felon, by means of a spring gun, unless the property owner would have been justified or excused, had he been personally present in the building to be protected, and had taken the life of the burglar and felon with his own hands.

In the present case let us suppose that, instead of an alleged "chicken-thief," an armed band of horse thieves or cattle thieves had arrived at midnight at the barn of defendant, and, while they were battering down the gates of the barn, defendant had fired from a window of his dwelling house, or from his backyard, and had killed one of the desperadoes.

Under the opinion of the majority, defendant would be clearly guilty of manslaughter at least, and would have to wear the stripes of a felon, although he is an honest farmer, and had done nothing but protect his property against armed violence.

On the other hand, let us also suppose that defendant was in the barn at the time the armed band of horse thieves and cattle thieves arrived, and commenced to break in. Had he fired a single fatal shot, before some overt act or hostile demonstration against his life had been made by some one of these armed marauders, he would be guilty of manslaughter, and condemned to hard labor in the state penitentiary.

Under the opinion of the majority, the only thing a farmer can do out in the country, where there is no police protection, is to step out in the open and invite a band of cattle thieves and horse thieves, seeking to loot his barn, *"to take the first shot,"* and, if any of the farmer is left, then the "leavings" have a legal right to defend themselves the best way that they can.

Let us also take the case of a merchant in the city of New Orleans, or in some other large city in the state. His warehouse has been burglarized and he desires to prevent future depredations. He places a watchman in this warehouse. At midnight, a truck loaded with gangsters arrives, armed with submachine guns, sawed-off shotguns, and automatic pistols. While the doors are being pried open, the rest of the gang stands with submachine guns and sawed-off shotguns at their disposal, ready to shoot down at sight any officer of the law who may approach, or any watchman who may be found inside of the warehouse. Should the watchman fire, as the gangsters break in, he would be shot dead on the spot, without a chance for his life.

3. As to the question whether an owner may set a spring gun in any store, shop, warehouse, barn, etc., to keep off burglars and others felons, there are two lines of conflicting decisions in this country. One line of these decisions holds that killing by spring guns when necessary *to exclude burglars is excusable, although the owner is not present at the time.* "Such guns may be used," says Wharton, "in a house to protect valuables there stored, but when they are negligently planted in a place where they may be reasonably expected to injure *ordinary trespassers* accustomed and likely to frequent such place, the killing of such a trespasser is manslaughter." (Italics mine.) Wharton Crim. Law, vol. 1 (11th Ed.) § 638, p. 813, citing State v. Moore, 31 Conn. 479, 83 Am. Dec. 159; Gray v. Combs, 7 J. J. Marsh. (Ky.) 478, 23 Am. Dec. 431; Hott v. Wilkes, 3 Barn. & Ald. 304, 25 Revised Rep. 400.

Wharton declares that: "The distinction is this: the agency is one which a house owner is entitled to use *in such a way as to keep off burglars and other felons.*" Wharton Crim. Law, vol. 1, § 592, p. 757.

In State v. Moore, a Connecticut case above cited, the spring gun was erected in a warehouse, and in Gray v. Combs, a Kentucky case above cited, the spring gun was set in a store, and the owner of the property was not present in either case.

The writer of this dissenting opinion considers that this line of decisions announces the better rule, since it relaxes the techni-

calities that usually surround and protect the felon, and is more in harmony with the temper of the times and the urgent need of society today for protection against violent and atrocious crimes.

We are not living in a calm and philosophical age, in which human life and property rights are generally respected. On the contrary, society is confronted today with the shocking and continuous depredations of organized, desperate, and merciless gangsters and racketeers.

Human life has become, in the eyes of these arch criminals, as cheap as meat in the butcher's stall and, in their eyes, property rights have lost entirely their legal sanctity.

In the midst of this chaos of crime, disorder, and defiance of constituted authority, courts and officers of the law have proven wholly inadequate for the necessary protection of either life or property.

What then is to be the end of it all, if the courts, under the time-worn technicalities of the criminal law, restrict the right of the lawful owner to protect his property against the gangsters and racketeers of today, only to cases in which the owner is present in the building, at the time of the breaking and the entering, and then only to the case in which the owner's life is in imminent danger and peril?

In this age of gangsters and gangster methods, the law-abiding citizen has no chance for his life, even when armed and present in his store, warehouse, or barn, when pitted against burglars and felons fully equipped with submachine guns, sawed-off shotguns, and automatic pistols.

Times change and we change with them, and the law must fit the necessities of the times in which we live, in order to afford adequate protection to society.

The time has come when the shadow of subtle technicalities must yield to the substance of reason and justice in the preservation of the social order. I therefore adhere to the line of decisions cited above.

For these reasons, I respectfully dissent from the opinion of the majority in this case.