STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

06-1263

STATE OF LOUISIANA

VERSUS

DEANDRE JOHNSON

\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 131,089-A
HONORABLE MARK A. JEANSONNE, DISTRICT JUDGE
\*\*\*\*\*\*\*\*\*\*

**GLENN B. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Oswald A. Decuir, Glenn B. Gremillion, and Billy Howard Ezell, Judges.

**REVERSED AND SENTENCE VACATED, RENDERED, AND REMANDED WITH INSTRUCTIONS.**

**Hon. Charles A. Riddle, III**
**District Attorney, 12th Judicial District Court**
**Michael F. Kelly, Asst. District Attorney**
**P. O. Box 1200**
**Marksville, LA 71351**
**(318) 253-6587**
**Counsel for Plaintiff/Appellee:**
    **State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**Counsel for Defendant/Appellant:**
**Deandre Johnson**

**Deandre Johnson**
**Louisiana State Penitentiary**
**CBA-L/R#8**
**Angola, LA 70712**
**In Proper Person:**
**Deandre Johnson**

GREMILLION, Judge.

In this case, the defendant, Deandre Johnson was convicted of second degree murder, a violation of La.R.S. 14:30.1, and was sentenced to life imprisonment without the benefit of parole. He has timely appealed asserting that he acted in self-defense and that the State did not prove beyond a reasonable doubt that the killing was not justified. In the alternative, he claims that the evidence was insufficient to prove second degree murder, but was sufficient to support the responsive verdict of manslaughter. Defendant also argues that the trial court erred when it denied his motion for a new trial. For the following reasons, we reverse the conviction for second degree murder and vacate the sentence, enter a conviction for manslaughter, and remand for resentencing. Further, we affirm the trial court's denial of his motion for a new trial.

## FACTS

The victim, Willous Johnson, went to Defendant's apartment, located in Hessmer, Louisiana, around eleven o'clock at night on December 2, 2004. An altercation occurred between the victim and Defendant at the door when the victim tried to force his way into the apartment. Defendant stabbed the victim in the neck with a kitchen knife. The victim left the doorway, but collapsed and died in the parking lot of the apartment complex. Defendant put the victim's body into the trunk of his live-in girlfriend's car and with her and two children he drove to Baton Rouge where he disposed of the body in a ditch along a country road. The next morning, he sent his girlfriend home. When she arrived back in Hessmer, she contacted the police

1

and led them to the body.  Defendant fled to California. He was apprehended ten months later.

## SELF DEFENSE

In his assignment of error, Defendant argues that the facts as presented to the jury did not sustain a verdict of second degree murder because he acted in self-defense. He claims that he stabbed the victim, who was his cousin, to prevent him from unlawfully entering his apartment to cause him great bodily harm or even death. Defendant asserts that his fear of great bodily harm or death was reasonable because the victim had severely beaten him a few weeks prior to the killing and was in possession of a gun when he attempted to force entry into his home.  He further maintains that the State did not prove beyond a reasonable doubt that he had the requisite intent to commit second degree murder. He argues, at the very least, that the act of stabbing was committed in the "heat of passion."

In *State In re D.P.B.*, 02-1742, pp. 4-6 (La. 5/20/03), 846 So.2d 753, 756-57 (footnote omitted) (alteration in original), wherein the accused asserted justifiable homicide, the supreme court observed:

> "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville,* 448 So.2d 676, 678 (La.1984).  Additionally, when circumstantial evidence forms the basis of the conviction, the evidence, "assuming every fact to be proved that the evidence tends to prove . . . must exclude every reasonable hypothesis of innocense." La. R.S. 15:438; *see State v. Jacobs*, 504 So.2d 817, 820 (La.1987) (all direct and circumstantial evidence must meet the Jackson test); *State v. Porretto,* 468 So.2d 1142, 1146 (La.1985) (La. R.S. 15:438 serves as an

2

evidentiary guide for the jury when considering circumstantial evidence). Furthermore, in a case in which defendant asserts that he acted in self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. *State v. Brown*, 414 So.2d 726, 728 (La.1982). When defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Matthews,* 464 So.2d 298 (La.1985).

Second degree murder is defined as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1. Justifiable homicide is defined, in pertinent part, as:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

. . . .

(4)(a) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40), against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises or motor vehicle. The homicide shall be justifiable even though the person committing the homicide does not retreat from the encounter.

La.R.S. 14:20.

At trial, Dr. L. J. Mayeux, coroner for Avoyelles Parish, testified regarding the autopsy report which established the cause of death of the victim. The autopsy was performed in Pointe Coupee Parish because that was where the body was found and decomposition had begun. Dr. Mayeux did not perform the autopsy, but testified from the autopsy report. He further testified as to the pictures taken of the

3

wounds inflicted on the victim. Dr. Mayeux stated that there were two knife wounds to the victim's neck. The first one, approximately three inches long, was a superficial wound. According to Dr. Mayeux, the second wound, which was the fatal wound, was located inside the first cut and was a deep cut that severed the carotid artery and the trachea. Dr. Mayeux said that the victim would have bled to death within three minutes of the infliction of the second wound. He further testified that the cut of the carotid artery would have caused a spraying of blood. Dr. Mayeux further stated that other than ascertaining that the knife was not serrated, there was nothing from the wounds to indicate what type of knife was used.

Jeffery Carmouche, a homicide detective with the Avoyelles Parish Sheriff's Office, testified that he was the lead investigator on this case. He stated he was notified of a homicide a little before midnight on December 2, 2004. The information was received from a 911 call placed a few minutes earlier. He said that the caller gave the name and location of the victim to the 911 operator. A Cottonport police officer heard the call and recognized the name of the victim and the Kricket Corner Apartments. The officer knew that the victim had a cousin, Defendant, living in that apartment complex. Detective Carmouche testified that the Hessmer City Police were already at the scene when he arrived. He said that they found Defendant's apartment unlocked and empty. Also, Defendant's live-in girlfriend's car, a 1998 green Chevrolet Malibu, was not in the parking lot.

Detective Carmouche testified that early in morning of December 3, 2004, they took Lawrence Johnson and Robert Jones into custody. It was Johnson who had made the 911 call. Later in the day, they took Dametria Clayton,

4

Defendant's live-in girlfriend, into custody and impounded her vehicle. Detective Carmouche identified pictures of the vehicle and of the blood found on the rear bumper and in the trunk of the car. Clayton eventually led the detective to the location of the victim's body outside of Baton Rouge.

Johnson, who lived in Marksville, testified he was not related to either the victim or Defendant. He said that he was a friend of the victim, but also knew Defendant on a more social basis. He stated that on the evening of December 2, 2004, he, Robert Jones, and Jones's three-year-old son, were cruising around with the victim in his girlfriend's car, a 1988 Oldsmobile. They stopped and bought beer. He stated that the victim might have drunk a can of beer. Johnson said that eventually they drove to Defendant's apartment complex in Hessmer where they smoked a marijuana cigarette. According to Johnson, the victim parked the car in an area that could not be seen from Defendant's apartment. The victim told the two men he was going to talk with his cousin, and he would be right back.

Johnson stated that he and Jones waited in the car for several minutes. He said that he finally got out of the car to check on the victim and found him laying in a pool of blood in the parking lot. He testified that he saw no one else in the parking lot. He stated that he and Jones left to get help. Johnson claimed that they did not know where the police department was in Hessmer, so they drove back to Marksville and called 911 from a friend's house. He said that he then called the victim's girlfriend, picked her up, and was on his way back to Hessmer when the police stopped him and took him into custody. He stated that when they arrived at Defendant's apartment complex, the body was gone.

5

On cross-examination, Johnson testified he had seen the victim earlier in the day with a small hand gun in his possession. However, he said he did not see the gun later that night. He also described a fight he had witnessed between the victim and Defendant approximately a month before, where the victim gave Defendant a thorough beating. He said that at the end of the fight, Defendant grabbed a pipe out of his car and chased after the victim.

Jones's testimony corroborated Johnson's testimony. He further testified that he had witnessed the fight between the victim and Defendant prior to the incident in question. He stated that the victim had to be pulled off Defendant; he then stated:

> Deandre was all beat up real bad, clothes all tore off and everything (UNINTELLIGIBLE) was trying to put Willous in the house, but Deandre started talking noise and Willous in the house, but Deandre started talking noise and Willous talking noise, but at that time Willous standing outside, he was torn down, you know, he was just like whatever I'm going to leave it alone. Then Deandre went to the car and got a . . .something like a stick, a long stick or something and chase behind him. When he was chasing behind him he told him when I catch you I'm going to kill you, but when he ran behind him he couldn't catch him.

Dametria Clayton, Defendant's live-in girlfriend and the mother of his two children, testified that on the evening of December 2, 2004, she was sleeping in the living room of the apartment when someone knocked on the door. She was eight months pregnant with their second child and had her sister's eight-week-old baby with her. Instead of answering the door, she went into the bedroom and woke Defendant. She testified that Defendant had been ill and had gone to the hospital earlier in the day. He had taken medicine and went to bed early. She stated that she followed him to the door. According to Clayton, Defendant tried to look out the kitchen window to see who was at the door or to see if there was a car outside, but he

6

could not see who was at the door. When he asked who was there, the victim answered, "Reese." She said when Defendant cracked the door to see if it was Reese, who was a friend of his, the victim tried to push his way into the apartment. She said that Defendant and the victim pushed the door back and forth while Defendant told the victim to leave, that "I don't have time for this." She said that Defendant could not get the door closed, so he picked up a knife laying on the counter next to the door. She claimed that the knife was a smooth-edged kitchen knife which had been left on the counter from putting up peaches earlier in the day. Clayton testified that because she was standing behind the door, she did not see Defendant stab the victim. She said she did not hear the victim threaten Defendant or Defendant threaten the victim. She stated that Defendant then left, came back into the apartment a few minutes later and told her to pack up the kids because they were going to leave. She said that she told him she did not want to leave and he said "[W]ell, I guess I have to kill you too." She testified that Defendant was scared and told her the victim had a gun.

Clayton testified that she saw the victim's body a few minutes later when they went out into the parking lot and got into the car. She said she did not see anyone, but later stated that she saw the victim's girlfriend's car in the parking lot with two men sitting in it. According to Clayton, Defendant drove a few miles and dropped her off. He returned a short time later, and she said he then told her that the victim's body was in the trunk of the car. She stated that they stopped at a car wash in Bunkie where Defendant washed the car, and they then drove to Baton Rouge. Once in Baton Rouge, Clayton said they found a dead-end road, and Defendant dumped the victim's body into a ditch beside the road. She said that they spent the

7

rest of the night at a friend's house. The next morning, Clayton stated that they went to Wal-Mart where she bought Defendant some clothes. She testified that they next went to a motel where she rented a room for Defendant for three nights. She said that she then returned to her mother's house in Hessmer with the children and the police were subsequently called.

Clayton testified that there was ongoing animosity between Defendant and the victim, particularly since the fight a few weeks before. She stated that the victim had messed with him earlier on the day of the killing. Clayton testified that the fight was about drugs and that the victim thought Defendant owed him something because he had done some prison time because of Defendant. She said that the victim did a year in prison following an event involving Defendant and a girl, and the victim had attacked the girl's father.

Claude Weatherford, a crime scene investigator with the Rapides Parish Sheriff's Office, testified regarding the blood located at the scene of the killing. He explained that the pictures submitted as exhibits showed the various locations of the blood from the door of the apartment to the pool of blood in the parking lot. According to his description of the location of the blood, the stabbing took place in the doorway of the apartment as described by Clayton. He said that there was a spray of blood on the door frame. His testimony reflected that the trail of blood grew heavier as it led to the parking lot, where a pool of blood was located with a drag mark through the blood.

As we noted above, when an accused raises self-defense, the burden is on the State to prove, beyond a reasonable doubt, that he did not act in self-defense.

8

"The determination of a defendant's culpability focuses on a two fold inquiry: 1) whether, from the facts presented, the defendant could have reasonably believed his life to be in imminent danger, and 2) whether deadly force was necessary to prevent the danger." *State v. Mills*, 04-489, p. 7 (La.App. 5 Cir. 3/29/05), 900 So.2d 953, 959, *writ denied,* 05-1470 (La. 1/13/06), 920 So.2d 235. "Factors to consider in determining whether a defendant had a reasonable belief the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing and the Defendant's knowledge of the assailant's bad character." *State v. Nelson,* 34,077, p. 6 (La.App. 2 Cir. 12/6/00), 775 So.2d 579, 584.

While there is no requirement that the accused must retreat from the confrontation, the possibility of escape is a factor to be considered in determining if the accused had a reasonable belief that the use of deadly force was necessary to avoid the danger. *State v. Woodhead,* 03-1036 (La.App. 5 Cir. 1/27/04), 866 So.2d 995, *writ denied,* 04-598 (La. 7/2/04), 877 So.2d 144.

In *State v. Eugene,* 03-1128 (La.App. 5 Cir. 1/27/04), 866 So.2d 985, *writ denied*, 04-0515 (La.App. 1/14/05), 889 So.2d 263, the defendant, convicted of second degree murder, alleged that she stabbed her boyfriend in self-defense. The fifth circuit affirmed Eugene's conviction despite overwhelming evidence that the victim routinely physically abused her. During her testimony, she stated that she feared for her life during the fight. She testified that as he was choking her, she pushed him away and went into the kitchen to get a knife. She testified he did not have a weapon. She returned to the living room and stabbed him as he sat in a chair.

9

The fifth circuit stated that "rational jurors could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense, and therefore, that defendant was guilty beyond a reasonable doubt." *Id*. at 993.

The State argues that Defendant had no reason to be afraid of the victim as he was not physically imposing. The record reflects that he was 5'9" tall and weighed 170 pounds. While the jury had the benefit of seeing Defendant in the courtroom, the jurors had to rely on Dr. Mayeux's testimony as to the victim's stature, which came from a report prepared by a third party.

Defendant argues that there was ample reason to fear great bodily harm, even for his life. The victim provoked the confrontation when he showed up late at night and unannounced, he hid his vehicle from view, and identified himself as someone else. Despite Defendant refusing to allow the victim to enter the apartment and telling him to leave, the victim continued to attempt to force his way inside. When he came back into the apartment after stabbing the victim, Defendant told Clayton that the victim had a gun. Clayton testified that the victim had "messed" with Defendant earlier in the day, and all three witnesses, Clayton, Johnson, and Jones, testified that the victim had given Defendant a severe beating a few weeks before the killing. Finally, Defendant knew that the victim had spent a year in prison for a crime of violence.

Defendant further argues retreat or escape was not an option in the present case. He claims that retreat was not an alternative because if he had retreated from the door, the victim would have entered the apartment and there was no evidence that he would then have had an avenue of escape. There was no testimony

that there was a back door out of which Defendant could have escaped, nor was there testimony that there was a phone which Defendant could have used to call for help. Neither the diagram of the apartment nor the pictures of the apartment complex admitted into evidence show a back door or a telephone in the apartment.

Defendant further argues that deadly force was necessary to stop the unlawful intrusion, and that force was justified by the "shoot the burglar" provision of La.R.S. 14:20(4)(a), cited above. Defendant points to *State In re: D.P.B.*, 846 So.2d 753, wherein the supreme court discussed the "shoot the burglar" provision as it was applicable to that case. D.P.B. was convicted of manslaughter. However, the court of appeal reversed, contending that the State failed to show D.P.B.'s actions were not justified pursuant to the "shoot the burglar" statute. The accused and his best friend had spent the evening drinking and fighting. According to witnesses, this was a familiar pattern in their relationship in that the two would drink, fight, then make-up the next day and be best friends again. On this particular night, after fighting all evening, the victim showed up at D.P.B.'s house in the early morning.

The pertinent facts are as follows:

Defendant was in his bedroom when he heard J.P.R.'s vehicle. He knew it was J.P.R. because he heard the activation of the vehicle alarm. Upon realizing it was J.P.R., defendant went from his bedroom to the living room where he observed J.P.R. enter through the unlocked carport door which led into the kitchen of the home. Defendant told J.P.R. to get out of the house or he would be shot. Defendant claimed J.P.R. told him to do what he had to do. Thereafter, defendant retrieved a .30-30 hunting rifle from the fireplace mantle of the living room and loaded two rounds of ammunition into the weapon before J.P.R. reached him. Defendant alleged he called for his father, who was asleep in his bedroom. Defendant claimed that J.P.R. grabbed the barrel of the weapon and the two struggled as they traveled approximately thirteen feet, ten inches from the fireplace into a hallway leading to the front door of the house.

11

In the hallway, the weapon discharged striking J.P.R. in the lower abdomen.

*Id.* at 755 (footnote imitted).

The supreme court reinstated the manslaughter conviction, finding that the provision did not apply in the case. The supreme court held:

> La. R.S. 14:20(4) provides that a homicide is justifiable when committed by a person lawfully inside a dwelling against a person who has made an unlawful entry into the dwelling and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises. Under the traditional statutes, La. R.S. 14:20(1) or (2), defendant would not have been justified in shooting his friend. However, the legislature's enactment of the "shoot the burglar" provisions of La. R.S. 14:20(3) or (4), eliminated any duty to retreat from an intruder in one's home, and eliminated any requirement that the shooter believe himself to be "in imminent danger of losing his life or receiving great bodily harm." Thus, the court of appeal embraced La. R.S. 14:20(4) to justify defendant's fatal shooting of his friend. However, we find this provision not applicable to the specific facts of this case.

> The instant set of circumstances surely is not what the legislature envisioned when it justified committing a homicide against a "person who is attempting to make an unlawful entry." La. R.S. 14:20(4). In *State v. Plumlee,* 177 La. 687, 149 So. 425 (1933), this Court stated that, "[O]ne has no right to take human life directly or indirectly to prevent trespass or any other petty crime." While *Plumlee* dealt with the justification of deadly force to prevent a felony, *see* La. R.S. 14:20(2), the Court's discussion of proportionate use of deadly force remains pertinent here:

>> Two things must concur in order to justify us in killing another to prevent him from committing some act; first, it must reasonably appear necessary in order to prevent him from committing a crime; and second, the crime to be prevented must be a great crime, and not a petty offense from which no great injury would result to us or others, in body or property. Therefore, if it reasonably appears that the crime can be prevented by any other available means, as by a warning, by a show of force, or by the use of any force short of killing, the killing would not be justified. And if the crime to be prevented was a petty offense, not

12

> likely to result in great injury in body or property to us or others, we would not be justified in killing to prevent it, even if it could not be prevented by any other means.

*Plumlee*, 149 So. at 428. In the instant case, the state offered several options, none of which would be considered retreat, but which would have been more reasonable than defendant using deadly force against his friend, J.P.R. First, defendant could have called 911. Second, he could have locked the carport door. Third, he could have awakened his father upon seeing J.P.R. enter the carport door. Fourth, he could have "beat his a--"again.

*Id.* at 755-56, (alteration in original).

In the present case, this court could determine that as in *D.P.B.*, Defendant's use of force was disproportionate to the circumstances of someone knocking on his door at eleven o'clock at night. Defendant had the option of not opening the door until he ascertained who was at the door or to call 911. In this instance, we find that the State met its burden of proving beyond a reasonable doubt that Defendant did not act in self-defense and that the "shot the burglar" provision is inapplicable. Accordingly, the killing was not justified and this assignment of error is without merit.

## MANSLAUGHTER

Even though we find that the killing was not justified, we find merit in Defendant's second assignment, that the evidence is insufficient to prove second degree murder, but would support a conviction of manslaughter because the State failed to prove that Defendant had the specific intent to kill the victim.

Manslaughter, in pertinent part, is defined as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control

and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.

La.R.S. 14:31(A)(1). While "sudden passion" and "heat of blood" are mitigating factors to a charge of murder, an accused need only establish the mitigating factors by a preponderance of the evidence. *State v. Fontenot,* 05-553 (La.App. 3 Cir. 12/30/05), 918 So.2d 1096; *State v. Baldwin*, 96-1660 (La. 12/12/97), 705 So.2d 1076, *cert. denied,* 525 U.S. 831, 119 S.Ct. 84 (1998).

Defendant asserts that the State failed to prove that he had the intent to kill the victim. To be convicted of second degree murder, the State has to show that an accused had the specific intent to either kill the victim or inflict great bodily harm. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the accused. *State v. Graham,* 420 So.2d 1126 (La.1982). The State points out that Defendant's actions were not consistent with someone who had stabbed another man in a reactive moment. He hid the body and fled to California. *See State v. Wallace,* 612 So.2d 183 (La.App. 1 Cir. 1992), *writ denied*, 614 So.2d 1253 (La.1993). However, Defendant argues that his actions after the killing were not indicative of his intent since he was in bed when the victim appeared at his door at eleven at night, he tried to keep the victim out of his house, yelled for him to go away, and only grabbed the knife off the counter during the scuffle. The evidence clearly shows that the victim provoked the confrontation in the first place.

14

We find that the circumstances of the present case are more like the circumstances in *State In re: D.P.B.*, 846 So.2d 753, wherein the victim entered the accused's house in a threatening manner without authorization, and the accused was convicted of manslaughter, as opposed to *Eugene*, 866 So.2d 985, wherein the defendant, who was convicted of second degree murder, left the victim sitting in a chair in the living room, walked into the kitchen to retrieve a knife, returned, and stabbed him.

The State argues that there was thirty days between the fight and this incident, therefore, Defendant's blood should have cooled. However, the fight was not the provocation for "the heat of blood" in this instance. Defendant was asleep when the victim arrived and did not want the victim in his home. He was tricked into opening his door and then had to fight to keep the victim out. He had a confrontation with the victim earlier in the day and had been beaten up by him less than a month before. While the force used in this case was excessive, we find that there was "provocation sufficient to deprive an average person of his self-control and cool reflection." In that regard, we hold that the jury abused its vast discretion in finding that Defendant committed second degree murder, and we reverse that conviction and vacate the sentence pronounced by the trial court for that crime. In its place, we enter a conviction of the lesser and included offense of manslaughter. The matter is remanded to the trial court for resentencing for the crime of manslaughter.

### NEW TRIAL

Finally, Defendant asserts that the trial court erred when it denied his motion for a new trial. In his motion, Defendant alleged:

15

[T]he defendant through the attorney has learned that the prosecution witness committed perjury in that he denied originally seeing a gun and removing a gun from the body of the victim. Further on information and belief the victim was attempting to kill the defendant. The above constitutes new evidence sufficient to grant a new trial.

At the hearing, defense counsel advised the trial court that he had subpoenaed several witnesses, including Lawrence Johnson and Anthony Simmons, who were the only ones to appear. Defense counsel put Simmons on the stand. He asked Simmons if Johnson told him that the victim had a gun on his person when he went to talk to Defendant on the evening of the killing and that he removed the gun after he found the victim dead in the parking lot. Simmons denied ever being told that.

Louisiana Code of Criminal Procedure Article 851(3) provides, in pertinent part, a trial court shall grant a motion for a new trial whenever "[n]ew and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty." Obviously, evidence that the victim was armed when he went up to Defendant's door and that one of the witnesses removed the gun from the victim's body after he died could have affected the outcome of the trial. However, based on the testimony given at the hearing on the Motion for a New Trial, this evidence simply did not exist, and the trial court had no recourse but to deny Defendant's motion. Therefore, this assignment of error has no merit.

**ERRORS PATENT**

We review all appeals for errors patent on the face of the record in accordance with La.Code Crim.P. art. 920. After reviewing the record, we find that there are no errors patent, but we note that the minutes of the jury's verdict contain an error. The minutes of the jury's verdict state that the jury's verdict was unanimous. However, the jury's verdict form and the transcript of the polling of the jury indicate that the jury's verdict was actually ten to two (10-2) for a conviction. Thus, the minutes of the jury's verdict should be amended to correctly reflect the polling of the jury; therefore, the trial court is ordered to amend the minutes accordingly with fifteen days of the date of this opinion.

**CONCLUSION**

We hold that the State did not prove that Defendant possessed the requisite intent to kill when he stabbed the victim, but rather, was acting in the "heat of blood" when he inflicted the injury which resulted in the victim's death. Accordingly, we reverse the conviction for the crime of second degree murder and vacate the sentence imposed by the trial court for that crime. We enter a conviction for the crime of manslaughter and remand to the trial court for the imposition of sentence. Finally, the minutes of the jury's verdict should be amended to correctly reflect that the jury's vote was ten to two (10-2) rather than unanimous.

**REVERSED AND SENTENCE VACATED, RENDERED, AND REMANDED WITH INSTRUCTIONS.**