**Ethel Bartlett SAULS, Plaintiff,**

v.

**James HUTTO and Frederick C. Rup-**
**pert, Jr., Defendants.**

**Civ. A. No. 16409.**

United States District Court
E. D. Louisiana,
New Orleans Division.

July 22, 1969.

August J. Bubert, New Orleans, La., for plaintiff.

Beuker F. Amann, New Orleans, La., for defendants.

RUBIN, District Judge:

A police officer who shot and killed a fleeing seventeen-year-old suspected of committing a felony is here sued for damages. The suit raises the question of justification for the use of deadly force in contemporary society.

## I. FACTS

On March 21, 1965, at about 10:00 p. m., two police officers, James Hutto and Frederick C. Ruppert, Jr., were operating Patrol Car 54. They drove to an ice cream parlor to investigate a complaint. While they were there, a Mustang automobile was driven recklessly past them at a high rate of speed. They jumped in the patrol car and, with Hutto driving, pursued the Mustang. Hutto turned on the blue police warning light and sounded the siren. But the driver of the Mustang continued to flee, driving through the streets of New Orleans at a high rate of speed. The defendants therefore suspected the speeding car was stolen.

There were four young men in the car. Philip Paul Bartlett, also known as Philip Sauls, was driving. According to the testimony of the three passengers, he had invited them for a ride. They also testified that Bartlett had told them the automobile belonged to his brother. In fact Bartlett had stolen the car by putting a jumper wire on the ignition circuit.

Four pistol shots were fired by Officer Ruppert at the racing car in an effort to bring it to a halt. One shot missed completely; two struck the car but did not penetrate it; and the last shot, which was fired at the car as it careened to its right around a corner on Esplanade Street, penetrated the right front door, ricocheted off the dashboard and fell spent inside the vehicle.

When the passengers heard Ruppert's shots and realized that the police were after them, one of them urged Bartlett to stop. Bartlett, however, said that the car was stolen, and that he could not afford to stop.

Bartlett lost control of the Mustang, and it crashed into a parked car. The police car also stopped, and the two policemen ran up, guns in hand. Three of the juveniles surrendered and Ruppert took them into custody. Bartlett, however, tried to escape, crouching as he ran away. Officer Hutto ran after him. He shot once at the fleeing boy, and his shot struck Bartlett in the back. Because Bartlett was bent over, the bullet went through his body at an angle, penetrated his liver, spleen, stomach and heart, and he fell dead in the street.

Shortly thereafter, Hutto said that he had not intended to kill Bartlett, but being excited, he was not entirely certain what had happened. One of the other occupants of the car was later found to be carrying a weapon. Some also had prior police records. All of them were hardened youths, and all later were convicted and sentenced for theft.

Defendants contend they had probable cause to arrest Bartlett for theft, and they are correct. Bartlett not only drove past them recklessly and wildly at a high rate of speed, but continued to race away when he knew the police were attempting to stop him. The defendants testified that it had been their experience that cars driven in such a manner late at night often are stolen and they suspected theft. Probable cause exists "if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." Henry v. United States, 1959, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134. Police officers often must make immediate judgments and the circumstances the court must consider "are those of the moment." Dixon v. United States, 1961,

111 U.S.App.D.C. 305, 296 F.2d 427, 428. In suspecting theft in these circumstances the defendants did not act imprudently, and they had probable cause to arrest the plaintiff for that offense. *See* Norman v. United States, 1967, 126 U.S.App.D.C. 387, 379 F.2d 164; Heit v. United States, 1967, 125 U.S.App.D.C. 338, 372 F.2d 911.

Suit is brought by the natural mother of the deceased (an illegitimate child) for damages under the Civil Rights Act, 42 U.S.C. § 1983, and under Louisiana law, LSA–C.C. Arts. 2315, 2316, under the doctrine of pendent jurisdiction. The police officers are no longer with the New Orleans police force and are presently unemployed. Therefore, should the plaintiff prevail, there is scant likelihood that any recovery can be effected, but the plaintiff seeks vindication for her son.

## II.   CIVIL RIGHTS ACT

Plaintiff bases her claim under 42 U.S.C. § 1983 on two grounds. (1) The defendant police officers violated Louisiana law in shooting her son and thereby deprived him of life without due process of law; (2) regardless of state law, the killing violated substantive due process and was therefore unconstitutional.

■ "[The] right to have state law obeyed is not a federal right protected by Section 1983," the Fifth Circuit recently held in Dorsey v. National Association For the Advancement of Colored People, 5 Cir. 1969, 408 F.2d 1022. *See also,* Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; Charters v. Shaffer, 3 Cir. 1950, 181 F.2d 764, 765; Love v. Navarro, C.D.Cal., 1967, 262 F. Supp. 520. *Cf.* Otto v. Somers, 6 Cir. 1964, 332 F.2d 697. Section 1983 protects only *federal* rights that are violated under color of state law. The Fourteenth Amendment does not import an overriding requirement that state officials obey state laws in every regard. "Mere violation of a state statute does not infringe the federal Constitution. * * * It was not intended by the Fourteenth Amendment and the Civil Rights

Acts that all matters formerly within the exclusive cognizance of the states should become matters of national concern." Snowden v. Hughes, *supra* at 11 of 321 U.S., at 402 of 64 S.Ct. If this were not so, virtually any suit for a tort committed by any state employee could be brought in federal court.

■ The second basis for plaintiff's claim under Section 1983 is in effect that any time a person is killed by a law enforcement officer merely to protect property, he has been deprived of his life without due process of law, and, consequently, his federal constitutional rights have been violated. Since plaintiff is entitled to recover damages for her son's death under state law, determination of her federal constitutional claim is pretermitted because it would afford her no additional relief. In Justice Peckham's words:

"Where a case in this court can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued and is not departed from without important reasons. In this case we think it much better to decide it with regard to the question of a local nature, involving the construction of the state statute * * * rather than to unnecessarily decide the * * * constitutional question appearing in the record." Siler v. Louisville and Nashville Railroad Co., 1909, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753.

## III.   PENDENT JURISDICTION

The court would lack jurisdiction of the plaintiff's claim for violation of state law were that claim brought alone. But "[p]endent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority * * *,' U.S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' " United Mine

Workers of America v. Gibbs, 1966, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218. The Court there set forth the principles for application of the doctrine:

"The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. [cases cited] The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole." [1] (Citations and footnotes omitted.)

In this case, the plaintiff's claims, both state and federal, have not only arisen "from a common nucleus of operative fact," but, as in Hurn v. Oursler,[2] spring from "identical facts"—the killing of her son.

Furthermore, plaintiff's federal claim clearly has "substance sufficient to confer subject matter jurisdiction on the court." In contending that her son's life was taken under color of state law in violation of his constitutional rights, she has presented the court with serious constitutional questions.[3] On the pleadings, she stated a cause of action under 42 U.S.C. § 1983, based on wanton police brutality; the facts do not support these charges, but this could not be determined until the trial was concluded.[4]

When, as in this case, there is both a substantial federal question and a common nucleus of operative fact between the federal and state claims, the court has the *power* to invoke pendent jurisdiction to resolve the state claim, even if it should decide the federal claim adversely to the plaintiff or, as here, "even if it omit[s] to decide them at all but decides the case on local or state questions only." Siler v. Louisville and Nashville Railroad Company, 1909, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753; Hurn v. Oursler, 1933, 289 U.S. 238, 243, 53 S.Ct. 586, 77 L.Ed. 1148.

However, as the Court pointed out in *Gibbs:*

"That power [to invoke pendent jurisdiction] need not be exercised in

---

1. In Hurn v. Oursler, 1933, 289 U.S. 238, 246, 53 S.Ct. 586, 77 L.Ed. 1148, pendent jurisdiction was tied to the concept "cause of action." What was required was "a single cause of action" supported by two grounds, one state and one federal. This concept is somewhat nebulous, and as the Court pointed out in United Mine Workers v. Gibbs, 1966, 383 U.S. 715, 724, 86 S.Ct. 1130, 1138, "has been the source of considerable confusion." In many instances pendent jurisdiction had been limited to cases like Hurn v. Oursler, *supra*, 289 U.S., at 246, 53 S.Ct., at 590, where the state and federal claims were "little more than the equivalent of different epithets to characterize the same group of circumstances." The Court noted in *Gibbs, supra* at 725 of 383 U.S. at 1138 of 86 S.Ct., that "[t]his limited approach is unnecessarily grudging" and attempted to clarify the doctrine. For a critique of the *Gibbs* case, see Shakman, "The New Pendent Jurisdiction of the Federal Courts," 20 Stan.L.Rev. 262 (1968). *See generally*, Note, "UMW v. Gibbs and Pendent Jurisdiction" 81 Harv.L.Rev.

657 (1968); Note, "The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts," 62 Col.L. Rev. 1018 (1962); Proposal of the American Law Institute, Chapter 85, Section 1313, 46 F.R.D. 141, 148 (1969); Hart and Wechsler, The Federal Courts and the Federal System, pp. 802–809.

2. 1933, 289 U.S. 238, 246, 53 S.Ct. 586, 77 L.Ed. 1148.

3. While agreeing that the claim raises serious constitutional questions, the court is in no way deciding these issues on the merits.

4. One commentator interprets *Gibbs* as "requir[ing] only that the federal claim be sufficient to warrant the introduction of evidence [in order] to fulfill the degree of substantiality needed to invoke pendent jurisdiction." Note, 13 Loyola L.Rev. 167, 169 (1966–67). *See also*, Note, "The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts." 62 Col.L.Rev. 1018, 1025–1026 (1962).

every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." 383 U.S. at 726, 86 S.Ct. at 1139. (Footnote omitted).[5]

This court agrees with Judge Magruder that ordinarily, "[F]ederal courts should not be overeager to hold on to the determination of issues that might be more appropriately left to settlement in state court litigation * * *" Strachman v. Palimer, 1 Cir. 1949, 177 F.2d 427, 433, 12 A.L.R.2d 687 (concurring opinion).[6] However, like Judge Magruder in the *Strachman* case,[7] the court is convinced that the interests of justice require that the state claim be decided in this case. Plaintiff's son was killed on March 21, 1965. Her suit requesting identical relief on federal and state grounds was filed in 1966, over three years ago. A full trial has been held on the merits, a trial that involved emotional distress and financial expense for both sides. As in Hurn v. Oursler, *supra*, the evidence presented at trial on the state claim was identical to that offered on the federal claim and could not be separated from it.[8]

Were the state claim to be dismissed on jurisdictional grounds, a new trial might have to be held based on evidence that is already over four years old. The Supreme Court said in Baltimore S.S. Co. v. Phillips, 1927, 274 U.S. 316, 47 S. Ct. 600, 71 L.Ed. 1069: "[T]he whole tendency of our decisions is to require a plaintiff to try his whole cause of action and his whole case at one time." Any other result in this case at this late date would be unfair and inconvenient to the litigants and would impose an unnecessary burden on the state legal system. Hence pendent jurisdiction is invoked to decide plaintiff's state claim.

## IV. RIGHT OF ACTION UNDER LOUISIANA LAW

■ The defendants contend that a mother has no right of action in Louisiana for the wrongful death of an illegitimate son. Louisiana has historically denied a mother the right to sue under such circumstances. Lynch v. Knoop, 1907, 118 La. 611, 43 So. 252, 8 L.R.A., N.S., 480; Scott v. LaFontaine, 4th La. App., 1962, 148 So.2d 780; Cheeks v. Fidelity & Casualty Co. of New York, 1st La.App., 1956, 87 So.2d 377. But the distinction drawn between mothers by Louisiana law has been held unconstitutional in Glona v. American Guarantee & Liability Ins. Co., 1968, 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441, as a violation of the Equal Protection Clause of the

5. *Gibbs* suggests a number of factors that should be considered in deciding whether to invoke pendent jurisdiction: convenience and fairness to the litigants, considerations of judicial economy such as the avoidance of piecemeal litigation, whether the federal claim was dismissed before or after trial, the nature of the evidence, the relative importance of the two claims, the avoidance of needless decisions of state law both as a matter of comity and to promote justice between the parties by procuring for them a surer-footed reading of applicable law. 383 U.S. at 726, 727, 86 S.Ct. 1130. *See* Note, "UMW v. Gibbs and Pendent Jurisdiction" 81 Harv.L.Rev. 657, 658 (1968).

6. *See also*, Shakman, "The New Pendent Jurisdiction of the Federal Courts," 20 Stan.L.Rev. 262, 265 (1968); Note, "UMW v. Gibbs and Pendent Jurisdiction," 81 Harv.L.Rev. 657, 665

(1968); Note, "The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts," 62 Col. L.Rev. 1018, 1043 (1962).

7. It should be noted that Judge Magruder concurred in invoking pendent jurisdiction inasmuch as trial had already been held. He also stressed that an equally important consideration is whether in deciding the federal claim, the court is required to hear virtually the entire evidence necessary to resolve the state claim.

8. For a good discussion of the importance of this consideration and its frequent misinterpretation, see Note, "The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts," 62 Col.L.Rev. 1018, 1045–1047 (1962). *See also*, Note, "UMW v. Gibbs and Pendent Jurisdiction," 81 Harv.L.Rev. 657, 660 (1968).

Fourteenth Amendment. *Accord*, Miles v. City-Parish Government of East Baton Rouge Parish, 1st La.App., 1969, 219 So. 2d 320. Plaintiff therefore has a right of action under LSA–C.C. Art. 2315 for the wrongful death of her son.

### V. USE OF DEADLY FORCE

Officer Hutto had probable cause to arrest Bartlett for theft, a felony not involving danger to life or person, and he reasonably believed that the suspect could not be immediately apprehended without the use of deadly force. In these circumstances, was he legally justified in shooting at the deceased? There has been a spate of literature dealing with this problem,[9] and various state legislatures have recently been reconsidering their laws to reflect current attitudes on it.[10]

At common law, any person, whether policeman or private citizen, was privileged to use *any* force necessary, albeit deadly, to apprehend a fleeing felon if he had cause to believe a felony[11] had been committed.[12] Deadly force, however, was never permissible to apprehend misdemeanants. To a great extent, this view was based on the fact that, at common law, felonies were punishable by death.[13]

Louisiana has not followed the common law approach. The provisions of the Louisiana Criminal Code and Code of Criminal Procedure when read together limit the use of deadly force even by police officers to situations involving danger to life or person.

Article 220 of the Code of Criminal Procedure provides:

"A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained."

The draftsmen of the Code pointed out in the Official Comment to Article 220 that the "requirement of reasonableness would preclude the use of clearly inappropriate force." More significant assist-

9. See, *e. g.*, Note, "The Use of Deadly Force in the Apprehension of Fugitives from Arrest," 14 McGill L.J. 293 (1968); Tsimbinos, "The Justified Use of Deadly Force," 4 Criminal Law Bulletin 3 (1968); McDonald, "Use of Force by Police to Effect Lawful Arrest," 9 Criminal Law Quarterly 435 (1966–67); Robin, "Justifiable Homicide by Police Officers," 54 Journal of Criminal Law, Criminology, and Police Science, 225 (1963); Comment, "Justification for the Use of Force in the Criminal Law," 13 Stan.L.Rev. 566 (1961); Comment, "The Use of Deadly Force in the Protection of Property Under the Model Penal Code," 59 Col.L.Rev. 1212 (1959).

10. New York, Illinois, Wisconsin and Michigan, for example, have all recently been wrestling with the problem. *See* Tsimbinos, "The Justified Use of Deadly Force," 4 Criminal Law Bulletin 3 (1968).

11. The common law felonies were murder, rape, manslaughter, robbery, sodomy, mayhem, burglary, arson, and larceny. 1 Wharton Criminal Law, § 26.

12. For a discussion of the common law view, see Union Indemnity Co. v. Webster, 1928, 6 Div. 950, 218 Ala. 468, 118 So. 794. *See also*, Annot. "Police Liability for Injury," 60 ALR2d 879, 888. This rule has been codified in at least fifteen states. Comment, "The Use of Deadly Force in the Protection of Property Under the Model Penal Code," 59 Col.L.Rev. 1212, 1219, n. 37 (1959). Distinctions have been drawn, however, both at common law and through legislation, between private citizens and police officers. Despite probable cause, private citizens are held liable if the deceased was not actually a felon. Police officers, however, are only liable if they had no probable cause *and* the victim was not actually a felon. Comment, *supra*, note 39 at 1219.

13. In State v. Bryant, 1871, 65 N.C. 327, 328, the court noted: "It must be, however, that the power of arresting and the means used, must be enlarged or modified by the character of the felony. The importance to society of having felons arrested in cases of capital felonies—such as murder and rape—must be much greater than in cases of inferior felonies, such as larceny."

ance in determining what is reasonable force on the part of police officers is provided by the definition of justifiable homicide in the Louisiana Criminal Code:

> "A homicide is justifiable:
>
> (1) When committed in self-defense
>
> \*   \*   \*
>
> (2) When committed, for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm, by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention.
>
> \*   \*   \* "   LSA–R.S. 14:20.

Thus, deadly force may not be used to prevent the commission of a felony involving only property, a marked departure from the common law rule.

█ Since it is illegal for one to use deadly force to *prevent* the commission of a felony involving only property, it is unreasonable (and inappropriate) for a policeman to use deadly force to *arrest* a man suspected of committing such a crime.[14]

The current Regulations on Firearms of the New Orleans Police Department also limit the use of deadly force in felony cases. They provide:

> "The use of deadly force shall be restricted to the apprehension of per-

petrators, who in the course of their criminal actions threaten the use of deadly force or apprehensions when officers believe that the person whose arrest is sought will cause death or serious bodily harm if his apprehension is delayed." [15]

The use of deadly force in apprehending persons suspected of committing felonies not involving danger to life or person has never been specifically considered by Louisiana's appellate courts. However, three cases have held that deadly force may not lawfully be used to arrest a misdemeanant or prevent the commission of a misdemeanor. State v. Turner, 1938, 190 La. 198, 182 So. 325; State v. Plumlee, 1933, 177 La. 687, 149 So. 425; Graham v. Ogden, 3d La.App., 1963, 157 So.2d 365. And two of them, State v. Turner, *supra*, and State v. Plumlee, *supra*, indicate that deadly force can be used only to prevent "a great crime." Both LSA–R.S. 14:20, which does not permit the use of deadly force in crimes not involving danger to life or person and LSA–R.S. 14:67, which provides for a 10 year maximum sentence for theft, suggest that Bartlett had not committed "a great crime," and that Officer Hutto acted unlawfully in using deadly force in an attempt to apprehend him.

The Model Penal Code [16] of the American Law Institute has followed the same

---

14. One commentator argues: "[I]t does not appear that society has any greater interest in apprehending a criminal than in preventing his crime." Comment, "The Use of Deadly Force in the Protection of Property Under the Model Penal Code," 59 Col.L.Rev. 1212, 1222 (1959). *See also*, McDonald, "Use of Force by Police to Effect Lawful Arrest," 9 Criminal Law Quarterly 435, 451–52 (1966–67). *But see*, Note, "The Use of Deadly Force in the Apprehension of Fugitives from Arrest," 14 McGill L.J. 293, 311 (1968).

15. New Orleans Police Department Regulation I–20, April 16, 1969.

16. The Model Penal Code provides: .
"The use of deadly force is not justifiable under this Section, unless:
(i) the arrest is for a felony \*   \*   \* ;
(iv) the [police officer] believes that:
(1) the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or
(2) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed."
American Law Institute, Model Penal Code, Section 3.07(2) (b) (i) (iv), pp. 56–57 (1962). *See* Comment, "The Use of Deadly Force in the Protection of Property Under the Model Penal Code," 59 Col.L.Rev. 1212 (1959).

approach as Louisiana [17] and does not permit the use of deadly force to make an arrest for a crime involving only property.[18] The various interests at stake have been balanced; the felon's life may be taken only if his escape would provide a threat to the life or personal safety of his fellow citizens.[19]

Our society does not lightly forfeit human life. No longer is there a host of felonies punishable by death.[20] Indeed, since June, 1967, no one has been executed in the United States for a criminal offense. Fifteen states have entirely eliminated the death penalty. Elsewhere capital punishment may be decreed only after due process of law has been afforded.

Hence a man's life may not be taken on the spot by a police officer without substantial justification. Bartlett, a theft suspect and reckless driver, was not killed by Officer Hutto in self defense; nor was he slain to prevent a crime involving danger to life or person, or even to property, from being completed. The theft of the automobile had been completed and its reckless course through New Orleans streets was at an end. The automobile and three of its passengers were in custody. There was no longer any danger to pedestrians or other drivers, as there had been, of course, while Bartlett was driving with the police in hot pursuit. Bartlett's death was not the result of the bullets fired at the fleeing automobile. He was shot only to prevent his escape.

If Bartlett had been arrested, fairly tried, and convicted for theft, he could have been sentenced to "not more than 10 years with or without hard labor." [21] He would have been eligible for parole after serving one-third of his sentence.[22] If he had in addition been tried and convicted of resisting arrest, his maximum sentence on that charge would have been six months and a $500 fine.[23]

Professor Mikell puts the question bluntly:

"It has been said, 'Why should not the man be shot down, the man who is running away with an automobile? * * *' May I ask what are we killing him for * * *. Are we killing him for stealing the automobile? If we catch him and try him we throw every protection around him. We say he cannot be tried until 12 men of the grand jury indict him, and then he cannot be convicted until 12 men of the petit jury have proved him guilty beyond a reasonable doubt, and then when we have done all that, what do we do to him? Put him before a policeman and have a policeman shoot him? Of course not. We give him three years in a penitentiary. It cannot be then that we allow the officer to kill him because he stole the automobile, because the statute provides only three years in a penitentiary for that

---

17. Indeed LSA–R.S. 14:20 was cited by Professor Wechsler, Chief Reporter of the Model Penal Code, as precedent for the Code's provisions on the use of deadly force. American Law Institute Proceedings, 1958, p. 285.

18. Professor Wechsler eloquently stated the basis for the Model Penal Code's (and Louisiana's) position:

"The preservation of life has such moral and ethical standing in our culture and society, that the deliberate sacrifice of life merely for the protection of property ought not to be sanc-

tioned by law." American Law Institute Proceedings, 1958, pp. 285–286.

19. See Tsimbinos, "The Justified Use of Deadly Force," 4 Criminal Law Bulletin 3, 17 (1968).

20. See note 11, supra.

21. LSA–R.S. 14:67.

22. LSA–R.S. 15:574.4, subd. A.

23. LSA–R.S. 14:108. See text at note 14.

* * * Is it for fleeing that we kill him? Fleeing from arrest is also a common-law offense and is punishable by a light penalty * * *. If we are not killing him for stealing the automobile and not killing him for fleeing, what are we killing him for?" Michael & Wechsler, Criminal Law and Its Administration, p. 82, n. 3 (1940).[24]

■ Louisiana's courts likely would take this view: a police officer is not justified in shooting at a man who is suspected of stealing an automobile in order to apprehend him.[25] A bullet in the back is not Louisiana's penalty for fleeing to escape arrest. Deadly force may be used only when life itself is endangered or great bodily harm is threatened.

■ Under LSA–C.C. Art. 2315, plaintiff is entitled to recover damages from Officer Hutto for the wrongful death of her son. A hearing will be held to determine damages. Officer Ruppert did not participate in Bartlett's killing, and judgment is rendered dismissing the suit as to him.

---

24. Nor is the need to deter resistance to arrest a sufficient justification for the use of deadly force. If this be society's concern, then resisting arrest itself should be made a serious felony. The limited statistical evidence available indicates that there has been no significant increase in felonies in those states that have forbidden the use of deadly force in preventing the commission of crimes not involving danger to life or person. *See* Tsimbinos, "The Justified Use of Deadly Force," 4 Criminal Law Bulletin 3, 19–20 (1968); F. B. I. Uniform Crime Report (1961); New York City Police Department Statistical Reports, June-October, 1967, p. 1. Police Commissioner Howard Leary of New York has stated:

"It is a step forward to have a clear statement that irresponsible teenagers whose actions happen to amount to felonies against property are not for that reason alone subject to death at the hands of a police officer attempting to arrest them."

Tsimbinos, "The Justified Use of Deadly Force," *supra* at 19.

25. Professor Prosser points out in his treatise that "deadly force may certainly be used to enforce the arrest of the dangerous criminal whose offense has threatened human life or society, but not one guilty of such felonies as theft, for which the state never punishes in death, and seldom by a major penalty." Prosser, Law of Torts, § 26. *See also*, Comment, "Tort Liability of Law Enforcement Officers & State Remedies," 29 La.L.Rev. 130, 131, n. 7 (1968); McDonald, "Use of Force by Police to Effect Lawful Arrest," 9 Criminal Law Quarterly 435, 451–52 (1966–67). *Contra*, Note, "The Use of Deadly Force in the Apprehension of Fugitives from Arrest," 14 McGill L.J. 293, 311 (1968); Robin, "Justifiable Homicide by Police Officers," 54 Journal of Criminal Law, Criminology, and Police Science 225, 231 (1963).