**Pearlie Lee LOVE, Individually, and for and in behalf of her minor children, Wanda Delores Love, et al.**

v.

**H. N. DAVIS, Sheriff of Bienville Parish, Louisiana, et al.**

Civ. A. No. 13262.

United States District Court,
W. D. Louisiana,
Shreveport Division.

April 18, 1972.

Addendum Feb. 13, 1973.

Louis Berry, Alexandria, La., Jack Greenberg and Norman C. Amaker, New York City, Paul Henry Kidd, Kidd & McLeod, Monroe, La., for plaintiff.

John T. Campbell, Campbell, Campbell, Marvin & Johnson, Minden, La., John R. Pleasant, Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, La., for defendants.

## OPINION

DAWKINS, Chief Judge.

This action was brought by plaintiff to recover damages, individually and for her minor children, for the fatal shooting of John Love. The complaint, fairly read, states a claim under 42 U.S.C. §§ 1983 and 1985, and those statutes' jurisdictional correlative, 28 U.S.C. § 1343, vests us with power to hear the case.

Cast as plaintiff in this suit is Pearlie Lee Love, wife of the decedent; and as defendants, H. N. Davis, Sheriff of Bienville Parish; United States Fidelity & Guaranty Company, surety on the Sheriff's official bond; Winston Spinks, Deputy Sheriff; Ernest Higginbotham, Marshal of Ringgold, Louisiana; Ray Sullivan, Deputy Marshal; and J. Eugene Smith, Louisiana Department of Public Safety, Driver's License Examiner.

United States Fidelity & Guaranty Company's motion for summary judgment was granted for the reason that Davis had acquired only a fidelity bond from that Company. In the course of the hearing, Smith was absolved of liability after we concluded that he had been impressed into service to drive Higginbotham in the chase and participated in no other fashion. After trial, plaintiff's motion to reinstate Sheriff Davis, whom we earlier had dismissed from the case, was granted. See Britt v. Merritt, 219 La. 333, 53 So.2d 121 (1951); Gates v. Hanover Insurance Company, 218 So. 2d 648 (La.App., 4th Cir., 1969).

The preponderance of credible testimony reveals the following facts: Mrs. Martha Jolley, operator of a local store, had received, for four or five months preceding the shooting (hereinafter described), obscene telephone calls from an unidentified person. The caller requested an appointment at her store where they could be alone for the purpose of sexual activity. Many conversations were abruptly ended by Mrs. Jolley when the caller refused to identify himself.

During the week before John Love was shot, the calls were placed more frequently and finally she recognized the voice as that of one of the people who shopped in her store. A plan was formulated by Deputy Sheriff Spinks to capture the anonymous caller. Mrs. Jolley was to hold the caller on the line by telling him she had a customer to wait on, then she would send someone to City Hall to notify one of the policemen. Mrs. Jolley identified the caller to Deputy Spinks, who apparently decided that no case could be made until the caller was caught on the telephone. Wednesday, May 17, the plan reached fruition when Love placed a call from a public telephone near City Hall to Martha Jolley. Spinks saw Love pass by minutes before. When word reached the Deputy, he proceeded in the direction toward

which Love had gone. Spinks pulled to the curb and reached the telephone before Love could hang up the receiver, arrested him, and enlisted the assistance of a passer-by to keep the phone off of the receiver until Spinks contacted him from Jolley's store. Spinks took Love to Mrs. Jolley's store, picked up her phone which had been left off the receiver, and spoke to the man in the phone booth. Love admitted his guilt. Spinks neither searched the suspect, nor handcuffed him. Love requested Spinks to permit him to see his wife, but Spinks acceded only to the extent of taking him to City Hall, where a phone was available, before the prisoner would be transported to the Parish Jail at Arcadia.

Spinks called City Hall on his radio while at Jolley's to notify Marshal Higginbotham that he had arrested Love. Ray Sullivan overheard this call in his radio-equipped vehicle and followed Spinks from Jolley's to City Hall, where the three, Love, Spinks, and Sullivan, met Higginbotham. As the four entered, Spinks received a long-distance telephone call. Love was told to sit down and chose a seat near the northwest corner of the City Hall by a door. Love again admitted making the calls and said that something had gotten into his head that he "had to have" Mrs. Jolley.

There was relatively little conversation before Love rose from his seat and bolted for the door, making good his momentary escape by brushing aside Marshal Higginbotham. The escapee fled in a northwesterly direction, refusing to heed Higginbotham's order to halt, though it was punctuated by a single shot into the air. Love's flight took him across an open pasture, never out of sight of Higginbotham, who was driven by Smith and was aided by Sullivan pursuing in a separate vehicle.

Love slipped through a barbed wire fence on the Bates Street (west side) of the pasture, narrowly avoiding a collision with the car driven by Smith. The Marshal got out of the vehicle, ordered Love to stop, and discharged his revolver again into the air. Without slowing, Love continued to race away. Higginbotham again called for Love to stop, then fired at or near the feet of the fleeting man. Smith called out that he thought Higginbotham had hit Love, but the Marshal was unsure and shot into the air once more, in attempt to stop Love. Spinks left City Hall after the others in pursuit of his prisoner and reached the wooded area where he found Love and dragged him into the open. The escapee was put into a police car, taken to a local doctor, who advised the authorities to send the victim to Confederate Memorial Hospital in Shreveport. An ambulance was summoned which took the mortally wounded Love and his wife to Shreveport within an hour of the shooting. He died in an emergency room after efforts to save him failed. The doctor who treated Love at the Hospital did not testify at the trial, nor did he answer letters sent to him which sought to elicit the number of bullets which struck the decedent and their points of entry and exit.

 There is not a scintilla of credible evidence to support the allegation that the police officials involved had conspired to kill Love. Therefore, we conclude that there is no theory upon which Ray Sullivan, Deputy Marshal for the Town of Ringgold, can be held responsible. Love was not Sullivan's prisoner, nor did Sullivan fire a single shot in pursuit of the escapee.

Thus pared down, only three men could be civilly liable for Love's death: Sheriff Davis, Deputy Spinks, and Marshal Higginbotham. The sole issue is whether on the facts, as they were developed above, may any one or all three of the officers be held liable.

 The seminal case for tort law involving police conduct under Section 1983 is Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). There, Chicago police officers entered plaintiff's residence without a warrant, searched the premises, and brought him to the station where he was questioned

for several hours and released without charge. Complainants alleged that they were routed from bed and forced to stand naked while defendants ransacked their home. The Supreme Court held that such conduct was actionable under Section 1983, despite the unlawfulness of the police conduct under State law. The *Monroe* Court gave that statute extremely broad reading. The Court read Section 1983 as legislation to enforce the Fourteenth Amendment and it is upon those general due process grounds that persons seek damages where officers use unreasonable physical violence.[1]

■ Plaintiffs in such situations need not allege or prove that there was an improper motive or unlawful intent to injure. In Whirl v. Kern, 407 F.2d 781 (5th Cir., 1969), the Court held:

"Decisions of the Supreme Court have repeatedly noted that a complaint under the Civil Rights Act should not be dismissed for failure to state 'a specific intent to deprive a person of a federal right.' [Citations omitted.] The Civil Rights Act, we are told, should be read 'against the background of tort liability that makes a man responsible for the natural consequences of his actions.' [Citation omitted.] We do no find in this language or in the language of the Act itself any intimation that an invasion of constitutional rights unaccompanied

by an improper motive lies beyond the reach of the Statute." (At p. 787.)[2]

Historically Courts of this State[3] and other jurisdictions[4] invariably have held that an officer who shoots a suspected misdemeanant may be found negligent if he shoots in order to prevent his escape. The development of the cases along felony-misdemeanor distinctions has been criticized in light of the enactment of statutory felonies which do not affect human life.[5] Judge Rubin, in Sauls v. Hutto, 304 F.Supp. 124 (E.D. La., 1969), couched the pertinent considerations in a different form:

"Louisiana has not followed the common law approach. The provisions of the Louisiana Criminal Code and Code of Criminal Procedure when read together limit the use of deadly force even by police officers to situations involving danger to life or person. . .

. . . . . .

". . . Thus deadly force may not be used to prevent commission of a felony involving only property, a marked departure from the common law rule.

"Since it is illegal for one to use deadly force to *prevent* the commission of a felony involving only property, it is unreasonable (and inappropriate) for a policeman to use deadly force to *arrest* a man suspected of committing such a crime." (At pp. 129–130.)

---

1. See Joseph v. Rowlen, 402 F.2d 367 (7th Cir., 1968); Morgan v. Labiak, 368 F.2d 338 (10th Cir., 1966); Brazier v. Cherry, 293 F.2d 401 (5th Cir., 1961); Jackson v. Martin, 261 F.Supp. 902 (N.D.Miss., 1966).

2. See also Jenkins v. Averett, 424 F.2d 1228 (4th Cir., 1970); Roberts v. Trapnell, 213 F.Supp. 49 (E.D.Pa., 1962).

3. State v. Turner, 190 La. 198, 182 So. 325 (1938); State v. Plumlee, 177 La. 687, 149 So. 425 (1933).

4. The Supreme Court of Mississippi, in State to Use of Johnston v. Cunningham, 107 Miss. 140, 65 So. 115, 117 (1914), wrote:

"There can be no question that a sheriff and the sureties on his official bond are liable in a civil action for damages arising from the intentional or negligent shooting of a misdemeanant who flees to avoid arrest. The officer owes to the fugitive the duty to exercise care and precaution not to injure him. He must not intentionally shoot a misdemeanant who is a fugitive, nor must he discharge a firearm while in pursuit, in such a manner as to cause such fugitive injury."
See generally 60 A.L.R.2d 873 (1958).

5. Sauls v. Hutto, *infra*, pp. 129–132; Comment, Use of Deadly Force in the Arrest Process, 31 La.L.R. 131 (1970).

The emphasis has changed from a mechanical decision based on whether the legislature has denominated a particular activity as a felony or a misdemeanor to distinguishing between those cases which involve physical violence to the person and those which do not.

Though hampered by the failure of the attending physician to testify or answer our written inquiries, we find, even assuming the bullet ricocheted, that the accidental killing of Love was the result of an intentional shot in his direction. Love forfeited his life for two crimes, assuming his guilt, for which the maximum possible sentence was three years and $5,500.[6]

Defendants' afterthought, never testified to at trial, is that the obscene telephone call suggested Love's intent to rape Mrs. Jolley, and, therefore, his death was occasioned by a police attempt to prevent Love from reaching the object of his lust. This is an appealing argument, and however much we might agree with its rationale, we find the facts do not support it. When Love left City Hall, he was heading in a direction which could take him to Mrs. Jolley's store; however, his access route to her, though we doubt his intent to proceed there, was interdicted by the path Higginbotham and Smith followed. When Love was shot, he was heading completely away from Mrs. Jolley's store. There is no reason to find that Higginbotham was shooting to prevent Love from reaching Mrs. Jolley. The Marshal merely shot to prevent Love's escape. The decedent then was not engaged in a crime which endangered anyone's life or personal safety, nor is there any sound reason to believe that this life-long resident of Ringgold, with a family there, employed and well known in the area, would present any great difficulty in effecting his recapture.

We find that under the circumstances Higginbotham acted unreasonably when he shot toward Love, and, therefore, we conclude that he was negligent. "Louisiana's Courts likely would take this view: a police officer is not justified in shooting at a man who [made obscene phone calls] in order to apprehend him. A bullet in the back is not Louisiana's penalty for fleeing to escape arrest. Deadly force may be used only when life itself is endangered or great bodily harm is threatened."[7]

Love was a prisoner of the Deputy Sheriff, and, had he been recaptured, he would have been returned to his custody. Therefore, Marshal Higginbotham's performance was as such the responsibility of Deputy Sheriff Spinks and Sheriff Davis.

The jurisprudence of this State is to the effect that if a deputy's act is one in violation of an official duty, or if he unfaithfully or improperly performs an official act in order to accomplish a desired end and death or injury results, the Sheriff also is responsible in damages.[8] Clearly, Marshal Higginbotham was performing an official act—the attempted recapture of Love—and we have concluded that it was done improperly and unreasonably;[9] consequently, Deputy Spinks and Sheriff Davis likewise are responsible, too.

6. LSA–R.S. § 14:110, 285.

7. Sauls v. Hutto, *supra*, p. 132.

8. Webb v. Zurich Insurance Co., 251 La. 558, 205 So.2d 398 (1967) ; Britt v. Merritt, *supra;* Polizzi v. Trist, 154 So.2d 84 (La.App., 4th Cir., 1963).

9. The Fifth Circuit wrote : "An arrest is often a stressful and unstable situation calling for discretion, speed, and on-the-spot evaluation. . . . As a result, constabulary latitudinarianism is important. . . . " (Whirl v. Kern, *supra,* 407 F.2d at pp. 790–791). However, the citizen is entitled to protection from excessive force.

■■ We assess plaintiff's damages for which Higginbotham, Davis, and Spinks are liable *in solido*,[10] at:

*Loss of companionship and support:*

| | | |
|---|---:|---:|
| Wife | $11,500 | |
| Oldest child | 7,000 | |
| Middle child | 8,000 | |
| Youngest child | 9,000 | $35,500 |
| Pain and suffering | | 2,000 |
| Funeral expense | | 500 |
| | | $38,000 |

## ADDENDUM TO RULING OF APRIL 18, 1972

Following our ruling of April 18, 1972, defendants Spinks and Davis filed a motion to vacate and set aside our original ruling herein, which we granted, by minute entry dated August 24, 1972, after hearing. We now set forth our reasons for this action:

■ These defendants' brief and argument upon this motion convinced this Court that it committed error by holding Davis and Spinks liable *in solido* with Higginbotham.

The theory under which we held Deputy Spinks and Sheriff Davis liable is set forth in the foregoing language in our original opinion:

"Love was a prisoner of the Deputy Sheriff, and, had he been recaptured, he would have been returned to his custody. Therefore, Marshal Higginbotham's performance was as such the responsibility of Deputy Sheriff Spinks and Sheriff Davis.

"The jurisprudence of this State is to the effect that if a deputy's act is one in violation of an official duty, or if he unfaithfully or improperly performs an official act in order to accomplish a desired end and death or injury results, the Sheriff also is responsible in damages. Clearly, Marshal Higginbotham was performing an official act—the attempted recapture of Love—and we have concluded that it was done improperly and unreasonably; consequently, Deputy Spinks and Sheriff Davis likewise are responsible, too."

■ Thus, we did not find personal involvement on the part of Deputy Spinks or Sheriff Davis sufficient to cause either to be liable. The conclusion reached was based upon State Court jurisprudence that police officials, by virtue of their official capacities, may be held liable for the acts of others, even absent personal involvement. Upon reconsideration, this Court came to the conclusion that, under the Civil Rights statutes upon which the Court's jurisdiction was based, these two defendants' involvement must be personal; and, if not, then they are not liable or responsible to plaintiff for the decedent's injury or death.

"The doctrine of respondeat superior has no place under the civil rights statutes, for '[p]ersonal involvement is contemplated.' Salazar v. Dowd, 256 F.Supp. 220, 223 (D.Colo.1966). Premised on personal culpability, these statutes are aimed at those who subject others to a deprivation of their constitutional rights, rather than at the state or city which employs them or the official with ultimate authority over them in the governmental heirarchy.

"Of course, supervisory personnel may be liable in damages if they personally participate in or direct the infliction of injury. Plaintiff does not charge, however, that the named defendants struck the blows, nor does he allege that they ordered the attack on plaintiff and the courts have uniformly held that police supervisory personnel are not liable for damages to one injured by police misconduct absent direct per-

10. Section 1983 incorporates LSA–R.C.C. 2315 and establishes a cause of action for wrongful death and a survivor action. See Brazier v. Cherry, 293 F.2d 401 (5th Cir., 1961).

The officers are solidarily liable as joint tort-feasors. Franks v. City of Alexandria, 128 So.2d 310 (La.App., 3d Cir., 1961).

sonal participation." Sanberg v. Daley, 306 F.Supp. 277, 278 (N.D.Ill., 1969). See also Patrum v. Martin, 292 F.Supp. 370 (W.D.Ky., 1968); Mack v. Lewis, 298 F.Supp. 1351 (S.D. Ga., 1969); Sauls v. Hutto, 304 F. Supp. 124 (E.D.La., 1969).

Accordingly, the motion by Spinks and Davis to vacate and set aside the judgment entered herein was granted, and they were dismissed as defendants in this suit as not liable under our ruling of April 18, 1972, in the written opinion filed herein.