MILLER, Judge.
Plaintiff Mrs. Octavia Landry appeals the dismissal of her claim for the death of her husband Norbert Landry. He was killed in a gun battle with defendants who were Lafayette police officers. The city and its insurer were also made defendants. We affirm.
Plaintiff contends the officers acted unreasonably, negligently and used excessive force in their attempt to apprehend a suspected burglar or burglars, and that they illegally made a forcible entry. Plaintiff argues there was no necessity for the forcible entry which brought about the gun battle.
After hearing four days of evidence, the trial judge assigned detailed written reasons rejecting plaintiff’s version of the facts and accepting that of the police officers. The evidence in the record amply supports the trial judge’s conclusions.
Where evidence is before the trier of fact which, upon a reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, the appellate court should not disturb this factual finding absent manifest error. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may believe its own evaluations and inferences are as reasonable. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
Decedent Norbert Landry was 60 years of age at the time- of this incident. He had managed the Four Acres Club, a bar and dancehall in Lafayette, for eight years. Because of problems with burglaries, he installed a burglar alarm system some four years before this incident. When the alarm sounded outside the Four Aces, the police would learn of this when a neighbor or passerby would telephone.
After this incident decedent told his son he had some trouble with the alarm system a day or so before, but had been unable to get it repaired. While closing the business shortly after midnight of September 22, 1971, the alarm sounded for about ten minutes. An unidentified person telephoned the city police to report the sounding of the burglary alarm. Three police units responded immediately, but by the time they arrived the alarm was no longer sounding.
First to arrive was an unmarked unit occupied by plain-clothed detectives Bras-seaux and Viator. They immediately ran to the front door and because of the good lighting in that area saw that although the front door was locked, there was no padlock in the hasp provided for one outside the front door. They heard scraping noises which sounded like metal breaking into metal and 'concluded a burglary was in progress.
Within ten seconds of Brasseaux and Viator’s arrival, uniformed officer Hebert arrived in his prominently marked city police unit. He immediately joined Bras-seaux and Viator at the front of the building.
Within one minute of Hebert’s arrival plainclothed detectives Celestine and Des-pany arrived in an unmarked unit. They positioned themselves at the rear corners of the building.
On arrival and several times thereafter the officers “hollered .several times that they were police and asked the man (or men) in the building to come out with his (their) hands up.” Someone came to the front door the top half of which was clear glass. There were curtains inside'the clear glass portion of the door. After the officers identified themselves as police and while uniformed officer Hebert was under the light in clear view, the curtains parted and a person was observed peering out. The suspected burglar then closed the cur *552 tains and the officers waited for him to open the door. The officers continued to call in loud voices advising they were police and wanted the occupant(s) to open the building and come out with hands up.
Shortly after the curtains closed, Des-pany heard the noise of someone running in the building and reported this to Celes-tine. Celestine ran to the front of the building and reported this to Brasseaux, Viator, and Hebert.
Brasseaux made the decision to enter the building and Celestine remained in front of the building. Brasseaux broke the front door glass and opened the door by hitting it with his shoulder. Brasseaux was first to enter followed immediately by Hebert and Viator.
The building was 97 feet long by 38 feet wide and, including windows which had been painted, had more than twelve possible exits. The front twenty feet of the building was used as a bar and the back seventy-seven feet as a dancehall. The bar was to the right of the entrance. Patrons could go from the front door into the dan-cehall by walking straight from the entrance to a four foot wide arched doorway located in line with and twenty feet inside the front door. The barroom was dimly lighted by lights in a clock, in the juke box, and by a permanently lighted beer sign. The dancehall was totally dark.
When these three officers entered the building they again announced their identity as police and asked the occupant (s) to surrender. Brasseaux held a small flashlight which he was pointing into the dimly lighted barroom. They were met by two shots, one of which struck Brasseaux in the hand and one of which hit a glass ashtray causing glass to cut Brasseaux’s neck. Brasseaux threw down his flashlight and all three officers fired into the dark in the area from which they had seen the gun-flashes. They sought cover inside the dimly lighted barroom and reloaded their revolvers. They continued to call out that they were police and asked the occupant (s) to throw out the gun. Additional shots were fired by the decedent. Brasseaux then hollered to Celestine who was in front of the building to get reinforcements and shotguns.
Celestine called by police radio seeking reinforcements and shotguns. Within minutes two marked city police units brought uniformed officers Guidry, Savoy, and Brunt. Two had shotguns loaded with 00 buckshot. Celestine told the officers that the three officers inside were under fire and had requested shotguns. Guidry, Savoy and Brunt entered the building and loudly announced they were police and asked the occupant (s) to throw out the gun and come out with hands up. They were again met with gunfire. All officers returned the fire and mortally wounded decedent.
After the shooting stopped, one officer went into the dancehall section and found Landry down but still holding a 38 caliber revolver. He kicked the gun from Landry’s hand and Landry said he had made a “terrible mistake.” The revolver had one live round in the chamber and five spent casings in the cylinder.
An ambulance was promptly secured and Landry was taken to Lafayette General Hospital. While in the emergency room Landry talked to his wife and son and it was thought he would survive. His wife requested a transfer to Charity Hospital and that was successfully accomplished. Landry expired some three hours after the tragic incident.
At the hospital, Landry told his son he had been having trouble with the alarm system and when the police came, he thought someone was trying to rob him. He said he did not know the police were there. He also told his son to go get some cash hidden in a storeroom.
There is no manifest error in the trial court’s finding the officers had probable cause to suspect there was a burglary in *553 progress and, under the circumstances, the police used an acceptable procedure to enter the building. This was the Lafayette Police Department’s established procedure at the time and it successfully avoided bloodshed in past situations. The police did not use deadly force until they had been fired upon by an unknown assailant from the darkened dancehall while they were in the dimly lighted barroom. One of their number had been shot by the unknown assailant and the officers could not persuade the assailant to identify himself or surrender.
There was another version of the events preceding the shootings. Mr. Charles Williams testified he was an eyewitness and had been with Mr. Landry just minutes before the alarm sounded. When he heard the alarm he stood by to see what would happen. He was within 125 feet of the front door and hid throughout the entire proceedings. He testified he watched the actions from the beginning and at one time hollered to the police telling them the owner was in the Four Aces. .He admitted he knew they didn’t hear him. Although the officers carefully looked into the area where Williams stated he was hiding (searching for possible snipers), Williams was not seen at the scene during or after the incident. Williams’ testimony was expressly rejected by the trial court on finding it impossible to believe.
Some of plaintiff’s other witnesses testified they heard Mr. Landry call out his nicknames during the shooting. This too was expressly rejected by the trial court on finding serious inconsistencies in their testimony.
Plaintiff cites several cases which we find inapposite. Only two cases involved related situations. The case of Taylor v. City of Baton Rouge, 233 So.2d 325 (La. App. 1 Cir. 1970) is distinguished in that there the court affirmed the trial court’s holding a police officer unjustifiably assaulted a person while arresting him for a traffic violation. We also distinguish Sauls v. Hutto, 304 F.Supp. 124 (La.1969), which awarded damages to the mother of a 17 year old boy shot by a police officer while fleeing the scene of a wrecked stolen car. In the instant case, as distinguished from Sauls, no deadly force was used by the police until they had been fired upon by an unknown assailant from the darkened area of the dancehall. The shooting occurred after an officer had been shot by decedent. Although the officers tried, they could not persuade the assailant to identify himself or to surrender.
The trial court judgment is affirmed at appellant’s costs.
Affirmed.