338 So.2d 1385 (1976)
Robert C. DYSON, Jr., et al.
v.
GULF MODULAR CORPORATION et al.
Evie Lee Creel DYSON et al.
v.
John D. BELCHER, Jr., et al.
No. 58180.
Supreme Court of Louisiana.
November 8, 1976.
*1387 John W. Anthony, Talley, Anthony, Hughes & Knight, Donald H. Lee, Seal, Lee, Branch & Brown, Bogalusa, for plaintiffs-applicants.
Ronald J. Brumfield, James, Knight & Brumfield, Franklinton, Michael J. Paduda, Jr., Gallaspy & Paduda, Bogalusa, John J. Cooper, Christovich & Kearney, New Orleans, for defendants-respondents.
DENNIS, Justice.
These consolidated wrongful death actions[*] were brought by the widow and children of Robert C. Dyson, Sr., a construction worker who was accidentally electrocuted on February 25, 1972, while he was engaged in the unloading and erection of a pre-fabricated home, being built for Gulf Modular Corporation on a rural site near Franklinton, Louisiana owned by Agri-Trading Corporation. The pre-fabricated components had been purchased from National Homes Corporation, a Texas corporation engaged in the manufacture and sale of pre-fabricated modular housing units. The decedent was employed by John D. Belcher, Jr., a sub-contractor for Gulf Modular, whose responsibility included assisting National Homes, and its employee, O. E. Waters, in the unloading and assembly of the pre-fabricated components at the construction site.
Prior to trial, the district court dismissed plaintiffs' tort claims against Belcher and his liability insurer, on the ground that their liability was exclusively in workmen's compensation. At the conclusion of trial, the district court dismissed plaintiffs' claims against Gulf Modular ruling that it was the deceased's "statutory employer" under La.R.S. 23:1061, and that as a consequence, its liability was exclusively in workmen's compensation. Plaintiffs' claims against Wayne Engerran, Agri-Trading Corporation, and Washington-St. Tammany Electric Cooperative were rejected, the trial judge having found that these defendants were not negligent. The trial judge found that the decedent's death was occasioned by the joint negligence of O. E. Waters, National Homes Corporation's employee, and John D. Belcher, Jr., and entered judgment in favor of the plaintiffs against Waters and National Homes, awarding the minor children of the deceased $7,500 each, awarding the major children of the deceased $5,000 each, and awarding $15,000 to Dyson's widow. He also allowed $1,302.46 in special damages.
*1388 Defendants Waters and National Homes Corporation appealed the trial court's decision to the First Circuit Court of Appeal, seeking exoneration from liability and alternatively urging that the damages awarded were excessive. Plaintiffs answered the appeal, reasserting their negligence claims against all defendants, and seeking an increase in the awards.
The court of appeal affirmed the judgment of the trial court insofar as it dismissed plaintiffs' claims against John D. Belcher, Jr., and Gulf Modular, and insofar as it absolved Wayne Engerran, Agri-Trading, and Washington-St. Tammany Electric Cooperative from liability for negligence. The court of appeal reversed the trial court's judgment against defendants Waters and National Homes, and dismissed plaintiffs' suit, finding, contrary to the findings of the trial judge, that Robert C. Dyson, Sr., had been contributorily negligent. Dyson v. Gulf Modular Corporation, 331 So.2d 543 (La.App. 1st Cir. 1976); Dyson v. Belcher, 331 So.2d 549 (La.App. 1st Cir. 1976).
We granted writs to examine whether the court of appeal properly reversed the trial court's determination that the decedent was free of contributory negligence. 334 So.2d 429 (La.1976). Our examination of the record convinces us that the court of appeal fell into error, and, for the reasons hereinafter set forth, we reverse and remand.
When the fatal accident occurred the decedent, Dyson, and his employer, Belcher, were assisting Waters, an employee of National Homes, in removing component parts of a pre-fabricated home from the trailer in which it had been transported to the construction site for assembly. The components had been delivered in a National Homes Corporation tractor-trailer. Mr. Engerran, Gulf Modular's employee, had directed Waters, the operator of the tractor-trailer, to the job site. The tractor was equipped with a thirty-six to forty-foot crane, which was used to transfer the prefabricated components from the trailer to their proper location on a pre-cast concrete slab. Normally, Waters would have positioned the trailer next to the concrete slab, disengaged the tractor, and stabilized it by means of "outriggers," so that he could operate the crane safely in the unloading operation. Early in the morning on the day of the accident, however, as the trailer was being positioned, it became mired in the mud, with its rear portion situated beneath two uninsulated transmission lines belonging to Washington-St. Tammany Electric Cooperative, Inc. One of the lines carried an electrical charge of approximately 7,600 volts. Waters uncoupled the tractor from the trailer and moved it to a position between the slab and the trailer and readied the crane for the unloading operation.
After Belcher and Dyson arrived at the job site, a discussion was held between Belcher and Waters, and perhaps Engerran, as to whether the unloading could begin or whether they should get a tractor or bulldozer to move the trailer to a more convenient spot. Though there was evidence Dyson was hard of hearing and the record is unclear whether he participated in, or listened to this discussion, the court of appeal concluded that he did hear the discussion, and that the presence of the electrical line was mentioned. Even so, the record suggests that Dyson played no part in electing to unload the trailer from where it was, beneath the high voltage line.
No attempt was made by those in charge at the job site to have the power in the line shut off, to insulate the line, as might have been done, according to the testimony of the defendants' expert witness, by means of a "rubber snake" insulator, or to provide Dyson with insulated gloves.
Belcher instructed Dyson to climb to the top of the trailer with him. It was their responsibility to attach a steel cable, extending from the end of the crane, by means of a "Y"-shaped bridle attached to the end of the cable to the components so that Waters, who operated the crane, could lift the pre-fabricated units out of the trailer and transfer them to the slab. One unit was removed successfully and placed on the slab. As Dyson held the cable taut and *1389 maneuvered the bridle into position so that Belcher could attach it to a second component, he was electrocuted, and Belcher was hurled from the trailer by the electric shock.
The record is unclear as to exactly how close the boom of the crane was to the transmission line, though the evidence indicates it was less than ten feet from the line. However, neither the trial court nor the court of appeal found that the crane's boom touched the power line. Rather, the facts adduced suggest that the electric current passed from the transmission line to the steel cable, and down the cable to the men. Though the trial judge, after hearing all the evidence, was unable to determine "with certainty if the cable did or did not come in direct contact with the power line," he observed that "[i]t does appear from the testimony, however, that the electricity arked [sic]" from the power line to the cable. The trial court also found that no witness testified he saw the cable come into contact with the power line. The trial judge was unwilling to conclude as a matter of fact that Dyson pulled the cable into contact with the power line, and thereby caused his own death. As we read his opinion, the trial judge found it more probable than not that the electricity jumped or arced from the transmission line to the cable being held in a stationary position at that time by Dyson.
The trial court found defendants Waters and Belcher negligent jointly for "setting up the dangerous situation by placing the trailer so close to the power line." Of course, the tort claims against Belcher were dismissed because the plaintiffs' recovery against that defendant would be limited to workmen's compensation benefits. The trial judge further specifically found Dyson free of contributory negligence, concluding that the defendants failed to establish by a preponderance of the evidence that Dyson's conduct was negligent, as required by Louisiana law. McInnis v. Fireman's Fund Ins. Co., 322 So.2d 155 (La.1975); Ginlee v. Helg, 251 La. 261, 203 So.2d 174 (1967). The trial judge observed that working in the vicinity of high voltage electrical wires is not per se contributory negligence, nor is it an assumption of the risk. Harper v. New Orleans Public Service, Inc., 300 So.2d 546 (La. App. 4th Cir. 1974); Barrois v. Service Drayage Company, 250 So.2d 135 (La.App. 4th Cir. 1971).
The First Circuit Court of Appeal rejected the finding of the trial court that Dyson was free of contributory negligence. The appellate court, relying on what is considered "unrebutted testimony of the only expert witness to testify in this cause," rejected the conclusion that the electricity arced from the transmission line to the cable, and instead decided, not unreasonably, that Dyson, in handling the bridle with insufficient care, caused the cable to come in contact with the power line. Direct contact must have occurred, in the court's view, because the expert testimony of a mechanical and electrical engineer, was that, under normal conditions, electricity would not arc more than one-quarter to one-half an inch from a line carrying a charge of 7,600 volts.
We conclude, however, the court of appeal fell into error in finding the expert witness's testimony "unrebutted." His own testimony on cross-examination indicated that factors such as weather, lightning, soil conditions and switching surges could have an effect on the likelihood of arcing. Several witnesses testified that the ground was wet, and the atmosphere foggy. Furthermore, switching surges, according to the expert's own testimony, are not an extraordinary occurrencethough he opined that such an occurrence at the precise moment Dyson was electrocuted, while not impossible, would be "highly improbable." Furthermore, the testimony of eye-witnesses Waters and Engerran supports the conclusion that arcing did occur. Each claimed to have seen arcing, describing it as a "ball of fire," and one describing a streak of blue light eight to sixteen inches long.
In Canter v. Koehring Company, 283 So.2d 716, 724 (La.1973), we set forth the standards of appellate review of facts in civil cases as follows:

*1390 "When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts."
The principal error of the court of appeal was in failing to apply these well settled principles. An appellate court is simply not free to substitute its own version of the facts, however reasonable it may be, for that found by the trial court, unless the lower court committed manifest error by finding facts not reasonably supported by credible evidence in the record. Canter v. Koehring Company, supra; Arabie v. Travelers Insurance Company, 325 So.2d 340 (La.App. 3d Cir. 1976); State Through the Department of Highways v. Smith, 324 So.2d 852 (La.App. 3d Cir. 1976); Landry v. City of Lafayette, 324 So.2d 550 (La.App. 3d Cir. 1975); Hoover v. Beatty, 323 So.2d 490 (La.App. 1st Cir. 1975); Francis v. Gerlach Meat Company, Inc., 319 So.2d 534 (La.App. 2d Cir. 1975); Dupre v. South Central Bell Telephone Company, 318 So.2d 145 (La.App. 3d Cir. 1975); Hampton v. State Farm Mutual Automobile Ins. Co., 317 So.2d 15 (La.App. 3d Cir. 1975); Aetna Life & Cas. Co. v. Finley's Sporting Goods, Inc., 306 So.2d 383 (La.App. 3d Cir. 1975).
In this case the finding of the trial judge that the electricity arced is supported by the testimony of witnesses whom he found to be credible. Although the trier of fact was required to give due consideration to the contradictory expert testimony, under the circumstances of this case he was not compelled to place more credence in it than the lay testimony. After all, the laymen, who were eye-witnesses to the electrocution, testified to what they observed under the actual conditions present at the time of the accident. The expert witness, although eminently qualified in his field, never visited the scene of the accident or inspected the high-power line which caused Dyson's death. Instead, he was placed in the position of attempting to reconstruct solely from the photographs and the lawyers' hypothetical questions, what could or could not have occurred with regard to the electricity flowing from the power line located upon a rural homesite near Franklinton on the day of the accident. The expert's own testimony, in fact, is subject to the interpretation that the electricity could have jumped from the power line to the cable without any act of carelessness on the employee's part.
Additionally, we must disagree with the court of appeal's assertion that, whenever one knowingly works in close proximity to high voltage power lines and commits an act which may be characterized as a "participating factor" in bringing himself into contact with the electricity, "then his action is deemed to be negligent and he is barred from recovery." 331 So.2d at 547. First, the rule that it is not per se contributory negligence for a person to work in close proximity to power lines would be eviscerated if a corollary rule were imposed that whenever a person's own actions bring him in contact with the wires he is ipso facto negligent. Furthermore, as we perceive the question of negligence, the determinative issue is always one of reasonableness or dutyi.e., did the party's conduct conform to the standard of care that would be exercised by a reasonable man; or did the conduct breach a duty imposed upon the party to protect against the particular risk from which the accident resulted. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 *1391 So.2d 620 (1972); Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (1970); Tri-State Insurance Co. v. Tidewater Trailer Mfg. Co., 312 So.2d 353 (La. App. 2d Cir. 1975); Page v. Green, 306 So.2d 847 (La.App. 2d Cir. 1975); Robertson, Reason Versus Rule in Louisiana Tort Law: Dialogues on Hill v. Lundin & Associates, Inc., 34 La.L.Rev. 1 (1972).
Finally, the trial court's finding of negligence on the part of Belcher and Waters is supportable by the evidence in the record. The testimony, while somewhat imprecise, indicates that the crane was set up so that the boom and cable were dangerously close to the high voltage line. Applicable federal regulations promulgated pursuant to the Occupational Safety and Health Act, 29 U.S.C. § 655, et seq., prohibit operation of a crane of the type in question within ten feet of uninsulated high power lines. 29 C.F.R. § 1910.180(J) (effective August 27, 1971). Though violation of this regulation does not constitute negligence per se, the trial court properly could consider this regulation in weighing the defendants' negligence. See Burley v. Louisiana Power & Light Co., 319 So.2d 334 (La. 1975). None of the available precautions mentioned earlier in this opinion were taken by the men who were responsible for the conditions under Which Dyson was required to work.
For the reasons assigned the judgment of the court of appeal insofar as it overturned the trial judge's determination of O. E. Waters' and National Homes Corporation's liability, is reversed and the trial court's judgment is reinstated. In all other respects the judgment of the court of appeal is affirmed. The cause is remanded to the court of appeal for consideration of the issues raised by the parties herein as to quantum.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
NOTES
[*] One is Robert C. Dyson, Jr., Edward Dyson, Richard C. Dyson, Jimmy Ray Dyson, Earl Dyson, and Robert C. Dyson, Jr., as Administrator and Tutor of Fred Dyson, Joseph Dyson, Neva Lee Dyson, Anthony Dyson and Norma Gayle Dyson v. Gulf Modular Corporation, John D. Belcher, Jr., O. E. Waters, National Homes Corporation, Wayne Engerran, Agri-Trading Corporation, Inc., Fidelity & Casualty Co. of New York, and Washington-St. Tammany Electric Cooperative, Inc.; the other is Evie Lee Creel Dyson, Individually and as Administratrix and Natural Tutrix of the Minors, Fred Dyson, Joseph Dyson, Anthony Dyson, Neva Lee Dyson and Norma Gayle Dyson v. John D. Belcher, Jr., Agri-Trading Corporation, Inc., Gulf Modular Corporation, National Homes Corporation, Wayne Engerran, Fidelity & Casualty Co. of New York, and Washington-St. Tammany Electric Cooperative, Inc.