846 So.2d 753 (2003)
STATE of Louisiana in the Interest of D.P.B.
No. 2002-CK-1742.
Supreme Court of Louisiana.
May 20, 2003.
Rehearing Denied June 20, 2003.
*754 Richard P. Ieyoub, Attorney General, Jerry L. Jones, District Attorney, David O. Harkins, Jr., Stephen T. Sylvester, Shirley M. Wilson, for Applicant.
Lavalle B. Salomon, Monroe, for Respondent.
TRAYLOR, J.
The juvenile, D.P.B., was adjudicated a delinquent for the crime of manslaughter, La. R.S. 14:31. He appealed, contending the state failed to prove beyond a reasonable doubt that the homicide was not justified. Finding merit in defendant's claim, the court of appeal reversed the trial court's adjudication and disposition. The state now seeks a writ of certiorari, contending the court of appeal erred in determining the evidence was insufficient to support the adjudication and disposition and in concluding the homicide was justified. Finding merit to the state's claim, we reverse the court of appeal judgment and reinstate the adjudication and disposition of the juvenile court.[1]

FACTS
On the evening of October 3, 2000, defendant, D.P.B., and his best friend, J.P.R., since second grade began the evening as they usually didin each other's company. J.P.R. picked up defendant in his Ford Mustang, and subsequently, picked up two of their friends, C.H. and E.U., and they rode to various places in West Monroe and Monroe, Louisiana. At some point that evening, C.H. began driving J.P.R.'s vehicle as J.P.R., defendant and E.U. began to consume alcohol with J.P.R. consuming the most.
Later that night, defendant and J.P.R. began fighting in the back seat of the vehicle because J.P.R., in his drunken state, kept leaning on defendant. The verbal altercation became physical as the two exchanged pushes, kicks and blows. Defendant and J.P.R. had a history of this wrestling-type fighting, but would always reconcile the following day.
At approximately 1:00 a.m., C.H. dropped defendant at the house he shared with his father and an older brother. Thereafter, C.H. drove to J.P.R.'s house, which is only minutes from defendant's house. C.H. and E.U. attempted to get a heavily intoxicated J.P.R. out of the vehicle and into his house, however, he refused to get out of the vehicle. Eventually, C.H. and E.U. walked to C.H.'s house, leaving *755 J.P.R. in his vehicle. At approximately 2:04 a.m., J.P.R. called defendant and, according to defendant, the two exchanged words and defendant hung up the telephone.
From this point, only defendant's version of the facts is known, as provided in his statement to police the morning of the incident.[2] A few minutes later J.P.R. drove up to defendant's home. Defendant was in his bedroom when he heard J.P.R.'s vehicle. He knew it was J.P.R. because he heard the activation of the vehicle alarm.[3] Upon realizing it was J.P.R., defendant went from his bedroom to the living room where he observed J.P.R. enter through the unlocked carport door which led into the kitchen of the home. Defendant told J.P.R. to get out of the house or he would be shot. Defendant claimed J.P.R. told him to do what he had to do. Thereafter, defendant retrieved a .30-30 hunting rifle from the fireplace mantle of the living room and loaded two rounds of ammunition into the weapon before J.P.R. reached him. Defendant alleged he called for his father, who was asleep in his bedroom. Defendant claimed that J.P.R. grabbed the barrel of the weapon and the two struggled as they traveled approximately thirteen feet, ten inches from the fireplace into a hallway leading to the front door of the house. In the hallway, the weapon discharged striking J.P.R. in the lower abdomen. The contact wound fatally injured J.P.R.

DISCUSSION
The state argues that the court of appeal substituted its view of the facts for that of the trial judge in determining that the evidence was insufficient to support the conviction. More specifically, the state argues the court of appeal erred in finding that under La. R.S. 14:20(4) the state failed to prove beyond a reasonable doubt that defendant believed deadly force was necessary to compel J.P.R. to leave his home. We find these contentions have merit.
La. R.S. 14:20(4) provides that a homicide is justifiable when committed by a person lawfully inside a dwelling against a person who has made an unlawful entry into the dwelling and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises. Under the traditional statutes, La. R.S. 14:20(1) or (2), defendant would not have been justified in shooting his friend. However, the legislature's enactment of the "shoot the burglar" provisions of La. R.S. 14:20(3) or (4), eliminated any duty to retreat from an intruder in one's home, and eliminated any requirement that the shooter believe himself to be "in imminent danger of losing his life or receiving great bodily harm." Thus, the court of appeal embraced La. R.S. 14:20(4) to justify defendant's fatal shooting of his friend. However, we find this provision not applicable to the specific facts of this case.
The instant set of circumstances surely is not what the legislature envisioned when it justified committing a homicide against a "person who is attempting to make an unlawful entry." La. R.S. 14:20(4). In State v. Plumlee, 177 La. 687, 149 So. 425 (1933), this Court stated that, "[O]ne has no right to take human life directly or indirectly to prevent trespass or any other petty crime." While Plumlee dealt with the justification of deadly force to prevent a felony, see La. R.S. 14:20(2), *756 the Court's discussion of proportionate use of deadly force remains pertinent here:
Two things must concur in order to justify us in killing another to prevent him from committing some act; first, it must reasonably appear necessary in order to prevent him from committing a crime; and second, the crime to be prevented must be a great crime, and not a petty offense from which no great injury would result to us or others, in body or property. Therefore, if it reasonably appears that the crime can be prevented by any other available means, as by a warning, by a show of force, or by the use of any force short of killing, the killing would not be justified. And if the crime to be prevented was a petty offense, not likely to result in great injury in body or property to us or others, we would not be justified in killing to prevent it, even if it could not be prevented by any other means.
Plumlee, 149 So. at 428. In the instant case, the state offered several options, none of which would be considered retreat, but which would have been more reasonable than defendant using deadly force against his friend, J.P.R. First, defendant could have called 911. Second, he could have locked the carport door. Third, he could have awakened his father upon seeing J.P.R. enter the carport door. Fourth, he could have "beat his a" again.
In a juvenile proceeding, the state's burden of proof is the same as in a criminal proceeding against an adultto prove beyond a reasonable doubt every element of the offense alleged in the petition. La. Ch.Code art. 883; In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)....[T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La.1984). Additionally, when circumstantial evidence forms the basis of the conviction, the evidence, "assuming every fact to be proved that the evidence tends to prove ... must exclude every reasonable hypothesis of innocense." La. R.S. 15:438; see State v. Jacobs, 504 So.2d 817, 820 (La.1987) (all direct and circumstantial evidence must meet the Jackson test); State v. Porretto, 468 So.2d 1142, 1146 (La.1985) (La. R.S. 15:438 serves as an evidentiary guide for the jury when considering circumstantial evidence). Furthermore, in a case in which defendant asserts that he acted in self-defense,[4] the state has the burden of *757 establishing beyond a reasonable doubt that he did not act in self-defense. State v. Brown, 414 So.2d 726, 728 (La.1982). When defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Matthews, 464 So.2d 298 (La. 1985).
The state sought to prove the elements of manslaughter, La. R.S. 14:31, by introducing the testimony of seven witnesses, namely, C.H. and E.U., friends of defendant and J.P.R.; Detective Gary Mercer; Dr. John Price; Officer Vincent Guiterez; Detective Mark Nappier; and Sergeant Jeff Harris.
C.H. and E.U. testified that as the evening of October 3, 2000 progressed, C.H. assumed the driving, while the other three began consuming alcohol, with J.P.R. consuming the majority of the alcohol. They testified that J.P.R. was very drunk and had trouble talking and keeping his balance. They recalled that curse words were exchanged, and a physical fight ensued between defendant and J.P.R. because J.P.R. kept leaning on defendant in the back seat of the Mustang. C.H. and E.U. indicated that such altercations were not unusual between the best friends and that they would regularly fight and make up, and then act as if nothing had happened.
C.H. testified that after they dropped defendant at his house, J.P.R. stated he "ought to go down there and whip his a...." He remembered that in his statement to the police, he indicated defendant threatened to kill J.P.R. that night, but he did not recall such a statement at the time of trial. C.H. testified that more than likely when he would go to defendant's house, J.P.R. would already be there and that defendant and J.P.R. spent a lot of time together.
E.U. testified that he had just met defendant and J.P.R. a few weeks earlier. He testified that defendant threatened to kill J.P.R. during their fight and that defendant stated he was not afraid to go to jail for murder. E.U. also testified that he did not believe defendant really meant it. He testified that J.P.R. indicated his intent to go to defendant's house and fight him.
Officer Gary Mercer responded to the shooting. Upon arrival at the scene, Officer Mercer made contact with defendant in and around the carport area. He testified defendant was rattling to anyone that walked by him. Officer Mercer testified that defendant stated he shot J.P.R. and that he, J.P.R., was trying to start a fight. Defendant further stated to Officer Mercer that he told J.P.R. that he had a gun and, if he, J.P.R., would not stop, he would shoot him. Officer Mercer testified that apparently J.P.R. did not stop and defendant indicated he stated to J.P.R., "Okay, bitch" and shot him. Officer Mercer also testified that upon arrival at the crime scene, he peered into the house through the front door and could see the body lying in the small hallway leading to the carport door.
Dr. John Price, the general surgeon who performed surgery on J.P.R., testified that the gunshot wound was a contact wound and that the weapon was either on the skin *758 or one or two inches away from the skin. He testified J.P.R. was shot in the lower abdomen, which is below the umbilicus. He testified that J.P.R. may have been within barrel reach of the weapon held by defendant.
Officer Vince Guiterez of the Monroe Police Department was the first to arrive at the scene. He testified that as he exited his car, defendant walked up to him and stated, "I'm the one that shot him." Upon entering the house, Officer Guiterez testified that he observed the condition of the house to be "just dirty" and nothing appeared to be in disarray. He did notice a picture frame on the floor in the hallway maybe about two and half feet from the body, indicating it was possible the frame fell when J.P.R. hit the wall after the shooting. Although, in his report, Officer Guiterez noted that defendant told him J.P.R. broke into the house, Officer Guiterez did not observe any "door busted" or any signs of forced entry.
Further, Officer Guiterez testified that defendant was placed in his police car and, while transporting him to the station, Officer Guiterez remembered defendant stating that "he'd shoot the m_____ f_____ again," and then proceeded to ask how fast the car would run. Officer Guiterez testified that defendant never indicated he was in fear of his life during the incident, did not appear to be remorseful and appeared belligerent and non-caring. Defendant asked if J.P.R. would be arrested for the alcohol consumption; however, Officer Guiterez testified that he never asked about J.P.R.'s condition. Once at the police station, Officer Guiterez recalled defendant mentioning his earlier fight with J.P.R. and how he "beat the m_____ f_____'s a___."
Detective Mark Nappier of the Monroe Police Department arrived upon the scene and entered the house after defendant and J.P.R.'s body were removed. In observing the crime scene, he did not see any indication of a struggle. He observed pools of blood on the floor and a broken picture frame in the hallway, near where J.P.R. had apparently fallen. He testified that there is a front door leading to a hallway that to the left leads to the carport door and to the right leads to bedrooms. Directly in front of the front door is a room, which has a fireplace. He estimated the distance between the fireplace to the hallway to be about ten to fifteen feet. He testified that according to defendant, a struggle ensued at the fireplace and continued toward the hallway, where J.P.R. was shot. However, Detective Nappier did not observe any signs of a struggle and did not observe anything knocked off the desk that was next to the fireplace. He stated the house was cluttered, but he did not observe anything out of place. Detective Nappier testified defendant informed him of the altercation between him and J.P.R. earlier that night and that he had beat J.P.R.'s "a." Defendant never told Detective Nappier that he was afraid of J.P.R. or that he was afraid J.P.R. would hurt him. Detective Nappier opined defendant and J.P.R. were physically about the same size. He also testified that no weapon was found on J.P.R. Further, Detective Nappier did not recall defendant ever telling him that J.P.R. broke into the house. When informed that J.P.R. died of the gunshot wound, Detective Nappier observed that defendant did not appear remorseful and merely wanted to know when he would be released.
Sergeant Jeff Harris of the Monroe Police Department, who specializes in crime scene investigation and identification, "worked" the crime scene by taking photographs, lifting fingerprints, making sketches, etc. He testified that he was not able to lift any useable fingerprints from *759 the weapon, not even defendant's fingerprints. He also testified that he did not observe any signs of a struggle in the house. He indicated the house was cluttered, but nothing was out of place. He testified that from the fireplace to the foyer was thirteen feet ten inches in distance.
Defendant's father, C.B., testified for the defense. He testified that he was home and asleep during the incident. He stated that he was awakened by a loud noise and defendant's calls for help during the course of the altercation. He heard the gunshot before he got to his bedroom door. As he opened the door, he saw J.P.R. leaning over in the hallway and defendant had fallen back against the front door. C.B. testified that he took the weapon from defendant, told him to call 911 and carried the weapon to his bedroom. He testified that he picked up a floor fan that had been knocked over. Further, C.B. testified that over the past three years prior to the incident J.P.R. "really wasn't allowed in the house except when I was there and he had permission daylight or dark" because he caught J.P.R. stealing liquor from his bar. He further stated that friends, including J.P.R., were not allowed in or to call the home after 11:00 p.m. on weekends. He further testified that he did not discourage defendant from hanging out with J.P.R. In fact, C.B. testified that he was enrolled as counsel of record for J.P.R. on two DWI cases in Monroe City Court at the time of this incident.
Based on a thorough review of the record, we find the evidence presented by the state satisfies the standard under Jackson v. Virginia, supra, namely, when viewed in the light most favorable to the prosecution, no independent or unbiased evidence supports defendant's contention that deadly force was necessary to compel his friend to leave. Testimony of the state's witnesses was sufficient to prove beyond a reasonable doubt that the shooting was not justified under Louisiana's "shoot the burglar" statute, La. R.S.14:20(4). The evidence demonstrated J.P.R. was drunk and unarmed when he entered defendant's home. No sign of forced entry was apparent, nor was there any sign of a struggle as indicated by defendant. The two teens had a history of regular wrestling-type fights, but always resumed their friendship. Defendant and J.P.R. were equally matched in size and weight, and had fought earlier that night, with defendant winning. Defendant stated to the officers that he told J.P.R. that if he did not leave he would shoot him. He admitted that after J.P.R. had arrived at the house, he armed himself with a .30-30 rifle.
Clearly, the court of appeal substituted its own judgment for that of the juvenile court judge when it reversed defendant's conviction. The appellate court appears to agree with the juvenile court's finding of fact, stating that based on "the overall evidence presented, a rational fact-finder might have reasonably concluded that defendant could not have believed the use of deadly force was necessary to compel his best friend to leave the home." Further, the court of appeal acknowledged that their fighting history failed to indicate that their previous altercations were anything more than wrestling matches which ended up with defendant and J.P.R. remaining friends. With this acknowledgment, the court of appeal concluded under these circumstances "it would have been rational to conclude that despite [J.P.R.'s] unauthorized entry into the home, defendant could not have reasonably believed that this fight would have been any different from before and that deadly force was not a necessary choice." Additionally, the court of appeal acknowledged defendant's earlier threat to kill J.P.R. The appellate court *760 noted defendant's lack of remorse and claims that he had beaten J.P.R. earlier in the evening indicated a lack of fear on his part. The court of appeal further acknowledged the lack of fear was supported by the questionable evidence of whether a struggle took place. Lastly, the appellate court agreed with the state that defendant could have locked the door, or awakened his father and avoid altogether whether deadly force was necessary.
Reviewing courts must recognize that the juvenile court judge observed the conduct and demeanor of the witnesses and was in the best position to determine credibility and weigh the evidence. Therefore, the juvenile court's factual findings and credibility determinations and assessment of the weight of particular testimony must be afforded great deference. Based on the facts of this case and evidence presented, the state established beyond a reasonable doubt that defendant could not have reasonably believed that deadly force was necessary to compel J.P.R. to leave his home. In addition, the state adequately negated defendant's hypothesis of innocence in that the shooting was an accident.
Accordingly, a review of both the facts and the law compels us to reverse the judgment of the court of appeal and reinstate the juvenile court's adjudication and disposition.

DECREE
For the above reasons, the judgment of the court of appeal is reversed and the adjudication and disposition of the juvenile court are reinstated.
NOTES
[1] Defendant was convicted of manslaughter. The trial court ordered the custody of defendant to remain with the State Department of Corrections until his twenty-first birthday, but suspended all but two years to be served in a secure setting.
[2] Defendant did not testify at his trial.
[3] However, Sergeant Harris testified J.P.R.'s key to his vehicle was found in the vehicle's ignition.
[4] In the instant case, on appeal to the Second Circuit, Court of Appeal, the defense sought to claim defendant's lethal actions were justified under either La. R.S. 14:20(3) or (4). Under those provisions, a homicide is justifiable:

(3) When committed against a person whom one reasonably believes to be likely to use any unlawful force against a person present in a dwelling or a place of business, or when committed against a person whom one reasonably believes is attempting to use any unlawful force against a person present in a motor vehicle as defined in R.S. 32:1(40), while committing or attempting to commit a burglary or robbery of such dwelling, business, or motor vehicle. The homicide shall be justifiable even though the person does not retreat from the encounter.
(4) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40), against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises or motor vehicle. The homicide shall be justifiable even though the person committing the homicide does not retreat from the encounter.